124 Cal.Rptr.2d 776 (2002)
101 Cal.App.4th 1149
The PEOPLE, Plaintiff and Appellant,
v.
Edwin Mark GREGORY, Defendant and Respondent.
No. F037202.
Court of Appeal, Fifth District.
September 4, 2002.
Review Granted November 26, 2002.
*779 Phillip J. Cline, District Attorney, Don H. Gallian and Carol B. Turner, Assistant Attorneys, for Plaintiff and Appellant.
Eric S. Multhaup, Mill Valley, for Defendant and Respondent.

OPINION
ARDAIZ, P.J.
In September 1993, respondent Edwin Mark Gregory (Edwin) pled not guilty and not guilty by reason of insanity (NGI) to a charge that, on September 5, 1993, he murdered Jack Burrow (Pen.Code, § 187).[1] He also denied personally using a firearm in commission of the offense (§ 12022.5, subd. (a)). Edwin was subsequently found incompetent to stand trial and committed to Atascadero State Hospital. Following restoration of his competence, he pled no contest to second degree murder and admitted the gun use allegation. A jury subsequently found him legally sane at the time of the offense. He was sentenced to 15 years to life in prison for the murder, plus 3 years for the firearm use enhancement, with a recommendation that he be allowed to serve his sentence at Atascadero. We affirmed the conviction on direct appeal. (People v. Gregory (Nov. 1, 1995, F021997 [nonpub. opn.].))[2]
Following two unsuccessful petitions, the instant habeas action was filed in superior court on April 12, 2000. An order to show cause issued and an evidentiary hearing was held. On November 20, 2000, the petition was granted on the basis that Edwin's no contest plea was not knowing, intelligent, and voluntary. The trial court found Edwin was not advised of, and could not appreciate, the possible defenses he was waiving, specifically so-called imperfect self-defense. Accordingly, the trial court vacated the judgment of conviction and sentence, and ordered Edwin's no contest plea set aside. This appeal, which is authorized by section 1506, followed. As we shall explain, we disagree with the trial court and reverse.

BACKGROUND

I.

The 1994 Trial
Evidence elicited at the 1994 trial on Edwin's sanity showed that at the conclusion of a meeting on September 5, 1993, Edwin shot and killed Jack Burrow, a business associate of Edwin and his father, without provocation. In a rambling statement given to police that evening, Edwin complained of Burrow's double-dealing business practices, which Edwin said had created "tremendous amounts of pressure" that were "killing" Edwin and destroying the relationship between his parents. Edwin claimed to have shot Burrow to protect himself and his family, because he could no longer handle the pressure.
Three psychiatristsDrs. Terrell, Velosa, and Millstestified as expert witnesses for the defense. All opined that *780 Edwin suffered from schizophrenia manifested most significantly by a paranoid delusion that persons acting through Burrow (notably Frank Lisney, a business contact in Russia) were intent on killing Edwin and his family. All three concluded Edwin was suffering from the disorder when he shot Burrow, such that he was incapable of appreciating the wrongfulness of his actions and thus was legally insane.
Psychologist and law professor Steven Morse appeared for the prosecution. Morse questioned whether Edwin's behavior prior to the shooting could be considered evidence of incipient schizophrenia; instead, he suggested its interpretation as such was the product of "retrospective bias." In Morse's opinion, Edwin was not manifestly psychotic until after he was jailed. Morse declined to express an opinion about whether, at the time of the shooting, Edwin was legally sane in the sense that he understood the difference between right and wrong; however, he did testify that Edwin was not so detached from reality at the time as to be considered legally insane.

II.

The Instant Petition
The instant petition for writ of habeas corpus asserted 10 separate claims. The Honorable John P. Moran issued an order to show cause on two of them and subsequently ordered an evidentiary hearing on the claim that Edwin's no contest plea was involuntary.[3] Judge Moran found a reasonable likelihood the plea was involuntary because, due to Edwin's mental illness, medication, and misadvice, he was not aware of the consequences of his plea and thought he would be placed in a mental hospital and not sent to prison. Judge Moran found the renewed petition proper, despite the lapse of time since Edwin's conviction and the prior unsuccessful petitions, based on the presentation of important additional evidence. Judge Moran's order concluded: "Further, the court is troubled by the fact that the plea bargain was of no real benefit to the petitioner that he would be convicted of first degree murder under the circumstancesand there was strong evidence negating second degree murder, evidence that he acted under the delusion that he was in imminent peril."
The People subsequently disqualified Judge Moran for bias, and the Honorable William Silveira, Jr., presided at the evidentiary hearing.
Evidence presented at that hearing showed that while confined at Atascadero due to his incompetence to stand trial, Edwin related to his mother that at the time of the shooting, he was extremely frightened and confused. He believed that Frank Lisney was directing, through Burrow and through the Russians, that Edwin and his father be killed and their family destroyed. Edwin believed he had to kill Burrow or Burrow was going to kill him.
While Edwin was at Atascadero, his parents, Dr. and Mrs. Gregory, met with Deputy District Attorney Bartlett. Although Bartlett denied agreeing to any such stipulation, Edwin's parents understood him to say that if two psychiatrists opined that Edwin was insane at the time of the crime, Edwin would "go to Atascadero NGI." The Gregorys communicated this belief to John Smurr, Edwin's attorney, and they also told Edwin himself many times between their meeting with Bartlett and the April 29, 1994, pretrial conference. Smurr subsequently told Mrs. Gregory that he would negotiate to close the case before the pretrial conference if he had the doctors' reports, *781 which Mrs. Gregory understood to mean that if two psychiatrists said Edwin was insane, "Smurr will negotiate to go through the procedures of Edwin getting his NGI." Mrs. Gregory told Edwin this.
By April 29, 1994, reports had been received from Drs. Pitts and Velosa, stating that Edwin was insane at the time of the shooting. On that day, Dr. and Mrs. Gregory waited in the court hallway while the pretrial conference was held in chambers. Afterward, Smurr told them that the prosecutor was insisting on a jury trial on the sanity issue, but Smurr did not see how it could go to trial with so many experts saying Edwin was insane. Smurr told the Gregorys not to worry because the prosecutor had no experts, and he assured them the case would settle at the "eleventh hour." He told them that Edwin would have to plead guilty to second degree murder, however. When Mrs. Gregory asked why second degree, Smurr told her about a case "with someone with a hair spray can that was mistaken for a gun or something."[4] This caused Mrs. Gregory to recall Edwin asking a question, while he was at Atascadero, concerning whether Burrow was wearing a bulletproof vest. Mrs. Gregory informed Smurr that Frank Lisney had arranged for Edwin to visit a gun factory in Russia, and that Edwin had seen bulletproof vests manufactured. She further related that Edwin had mentioned that Burrow was carrying his briefcase, and that Edwin was afraid he had a gun in it.
While Mrs. Gregory was aware the People had the right to insist on a jury trial, she did not tell Edwin about the trial because she still believed, based on Smurr's assurances, that the case would settle at the last minute. In addition, Edwin was "very fragile" and she did not want to scare him. Dr. Gregory also continued to tell Edwin that if doctors reported he was insane, he would be found not guilty by reason of insanity. Dr. Gregory recalled Smurr telling him that Edwin would plead to second degree murder, after which they would proceed to the sanity phase. Dr. Gregory conveyed this information to Edwin sometime between April 29 and May 16. Dr. Gregory believed it was in Edwin's best interest to plead guilty to second degree murder. On May 2, 1994, Mrs. Gregory told Edwin he would have to plead guilty to second degree murder. She explained to him that this was a matter of formality, "that we have to get through this stage for [Edwin] to get his NGI."
On May 14, 1994, Mrs. Gregory explained to Edwin the procedure for the entry of his plea. She felt Edwin understood, as he asked appropriate questions. The next day, however, she spoke to him by telephone. He sounded confused, nervous, and scared.
On May 16, prior to entering his plea, Edwin met with Smurr and Edwin's cousin, Attorney Gregory Altounian, a civil law practitioner. Altounian did not recall Smurr telling Edwin the maximum time he could spend in a locked institution if a jury found him sane, although he did tell Edwin that if he were found sane at the time of the offense, he would go to prison instead of a mental hospital. Altounian did not hear Smurr advise Edwin of any defenses, such as imperfect self-defense. After the meeting, Altounian told Smurr that in his opinion, Edwin had "no clue" as to what *782 Smurr was telling him. Smurr did not respond, but continued into the courtroom.
Dr. and Mrs. Gregory, Edwin's brother Eric, and Altounian all felt, based on how Edwin acted in court during the change of plea proceedings, that Edwin did not understand what was occurring. The next day, Edwin appeared to Mrs. Gregory to be totally confused as to what had happened the day before. No one mentioned anything to Smurr or the court because they wanted to get through the plea and into the sanity trial, as all of the doctors were saying Edwin was insane.
Dr. Gregory was aware at the time of the plea that a jury trial was possible, but he was still under the impression from Smurr that the case would settle before trial because no one had rendered an opposite opinion regarding Edwin's sanity. Smurr never explained to Mrs. Gregory the effect of pleading guilty to second degree murder, as opposed to first degree murder or manslaughter, or the amount of time Edwin could expect to be kept in a state hospital if he were found not guilty by reason of insanity. He likewise did not discuss with her the maximum terms of imprisonment that could be imposed for first or second degree murder or manslaughter, should Edwin be found sane.
Edwin testified that while he was at Atascadero following his arrest, he understood there was a criminal charge pending against him, and he probably knew it was murder. He also understood there were different possible outcomes of the criminal charge, including not guilty by reason of insanity. Edwin understood that if he were to be found not guilty by reason of insanity, he would be sent to Atascadero and would be given better medical treatment there than at a prison. He also understood that if he were just found guilty of the charge, he would be sent to prison. While he was at Atascadero, Edwin's parents told him that if two doctors were to find him insane at the time of the crime, he would go to Atascadero. They continued to tell him this after he was returned to Tulare County to stand trial.
After Edwin returned to Tulare County, he had difficulty remembering things people told him. When asked if he recalled anyone explaining to him, outside of court before the date of the plea, about the process of him pleading guilty and going on to an insanity trial, Edwin responded, "Well, I remember my parents trying to explain to me something, but what mostly I remember is me not understanding what they were trying to say. [¶] Mostly I do remember them saying that I had to get past this next phase as a formality. That's what I understood from my parents. And anything else was not clear to me."
Edwin recalled meeting with Smurr prior to the change of plea proceedings, but did not know what was going to happen when he entered the courtroom and was unable to make sense out of what Smurr was telling him, as it seemed Smurr was not speaking English. Edwin did not ask Smurr for clarification because he believed, from what his parents had told him, that the plea was a formality so that he would be found not guilty by reason of insanity. He was concerned that if he told Smurr his difficulty, Smurr would call off the court proceedings. When he entered the courtroom, Edwin still felt confused and did not know what was to happen. As the judge began to explain to him the rights he was giving up by entering a plea, he finally realized that he was to plead guilty to second degree murder. When the judge began asking him questions, Edwin initially was honest and said he did not understand. He stopped asking for clarification, however, because he remembered his parents telling him that he needed to get past this stage as a formality, and he *783 thought he would not be able to do that if he kept telling the judge that he did not understand the questions. Edwin then answered the questions in a manner he thought would be appropriate, even though he did not understand them. Edwin believed he would be found not guilty by reason of insanity if he pled guilty.
Edwin testified that before he entered his plea, no one told him that there had never been a jury verdict of insanity in Tulare County, or that his chances of being found insane by a jury were slim to none. Edwin did not recall Smurr ever discussing manslaughter or imperfect self-defense with him, although Smurr may have done so. Edwin first learned about imperfect self-defense in the law library at prison four years before the evidentiary hearing. Had the judge or an attorney told him how low his chances were of obtaining an insanity verdict at a jury trial, and had someone told him about the alternative possibility of manslaughter, he would not have pled guilty to second degree murder.
Smurr testified that he began representing Edwin shortly after the homicide. From January 1994 on, Smurr's focus, with the agreement of Edwin and his parents, was on developing an insanity defense. Edwin's parents were concerned that Edwin be hospitalized and not go to prison. Smurr retained Drs. Mills and Terrell to assist him in developing the insanity defense. By the spring of 1994, all of the court-appointed and retained doctors had concluded Edwin was insane at the time of the killing, and Smurr was relatively optimistic about the prospects for a disposition of the case, as the prosecutor had not presented him with any evidence to the contrary.
At the April 29, 1994, pretrial conference, Judge Moran agreed with Smurr's theory that Edwin was not guilty by reason of insanity, but alerted Smurr to the fact that a Tulare County jury had never accepted such psychiatric testimony. Smurr was certain he told Edwin's parents about the purported propensity for Tulare County juries not to return insanity verdicts, and was also sure he told Edwin, although he had no independent recollection of relating to Edwin what occurred in chambers at the pretrial conference. He was not sure Edwin was able to process what the information would mean as far as his fate was concerned. During this period of time, Smurr was concerned Edwin would "overload," and he "was always sort of tiptoeing around because [he] didn't want [Edwin] to decompensate." While Smurr would tell Edwin certain things, he never wanted to overwhelm Edwin with too much information because Edwin did not "process like a normal human being."
Between the pretrial conference and plea, Smurr expressed optimism to the family about the outcome of the sanity trial. After the pretrial conference, Smurr reached an agreement with the prosecutor about Edwin pleading to second degree murder. Smurr was sure he conveyed this information to Edwin's parents. He was also sure he immediately told Edwin, but did not discuss it with him in earnest.
On the day of the plea, Smurr told Edwin what would occur and addressed the rights that were to be articulated in the courtroom, but, looking back, he was "not satisfied that [Edwin] processed them." Edwin appeared to be medicated. In retrospect, Smurr would have had a psychiatrist with him to assure that Edwin had processed the information and knew he was waiving certain rights. At the time of the plea, however, he did not feel it was necessary. Although, on the day of the plea, Smurr believed it to be in Edwin's best interest to enter a guilty plea to second degree murder, Smurr could not presently *784 assure the trial court that on May 16, 1994, Edwin actually understood his legal options, the "upsides and downsides of the different possibilities, and [that Edwin] independently concluded that second degree murder plea was the best thing for him to do."
Although Smurr briefly considered imperfect self-defense and discussed it with a partner of his, he did not discuss it with Edwin because he did not believe it would work in the community and he felt Edwin would not understand the concept. Similarly, Smurr did not discuss imperfect self-defense with Edwin's family because he did not think it was a viable option. He kept telling Edwin's parents that with the doctors' reports, obviously Edwin should be not guilty by reason of insanity either through a court trial or stipulation. Smurr never asked any of the psychiatrists to assess the viability of imperfect self-defense.
Dr. Terrell examined Edwin on several occasions. From his October 9, 1993, examination, Terrell formed the opinion that, at the time of the shooting, Edwin believed Frank Lisney was directed by the devil and meant to commit considerable harm to Edwin and his parents, and that Lisney could channel himself through Jack Burrow. Terrell concluded this was likely the motive for the shooting, and at the time of the crime, Edwin was acting in what he sincerely believed, due to his paranoid and psychotic mental disorder, to be self-defense. On this basis, Terrell opined that Edwin did not fully comprehend the wrongfulness of his action. Terrell believed Edwin's mental illness would have fit within the legal definition of imperfect self-defense. He did not recall Smurr discussing the concept with him, nor did he recall discussing guilt phase defenses with Edwin.
Terrell interviewed Edwin on May 15, 1994, in preparation for Terrell's trial testimony. He was unaware Edwin was going to plead guilty the next day, and was not there to determine competency to enter a plea. Based on his interview with Edwin, the transcript of the plea proceedings, and his observation of Edwin testifying at the evidentiary hearing, Terrell had serious doubts about whether Edwin understood the consequences of his plea on May 16, 1994, although Terrell did feel Edwin was competent to stand trial. Given Edwin's mental state on May 15, which in all likelihood would not have substantially improved by May 16, it would have been virtually impossible for Edwin to understand and adequately comprehend the possible sentences attached to first and second degree murder and manslaughter that he faced depending on whether he pled guilty or went to trial and was convicted, or adequately to understand his various options had they been explained to him.
Dr. Mills, who examined Edwin on May 11,1994, testified consistently with Terrell. In Mills's opinion, Edwin did not understand the consequences of his plea. Smurr never asked Mills to explore imperfect self-defense with Edwin. According to Mills, Edwin may have placed undue emphasis on the information given him by his parents, because people with paranoid schizophrenia tend to trust very few people and, hence, the people they do trust have a disproportionately large effect on their opinions and beliefs.

III.

The Trial Court's Ruling
At the close of evidence and argument, the trial court granted Edwin's petition, vacated the July 8, 1994, judgment of conviction and sentence, and ordered Edwin's no contest plea set aside. Edwin then entered a plea of not guilty and not guilty by reason of insanity. The court specifically *785 found that, based on the totality of the evidence, Edwin's plea was not voluntarily made, and was not knowing and intelligent, "in that he was not advised of and could not appreciate the possible defenses that he was waiving when he pled guilty [sic] to the charge and was not, in fact, advised of them." The court found the plea could not have been knowingly, intelligently, and voluntarily made because the court that took Edwin's plea failed to ask either Edwin or Smurr if Edwin was advised of possible defenses he might have raised to the charge had he gone to trial. The court further found that Edwin's mental state at the time he entered the plea made it doubtful he "could have, in any event, understood the concept of imperfect self-defense, at least not without a great deal more instruction and advice than he had." The court explained:
"The only indications that this Court heard on the record regarding advice of defenses and discussion of this with [Edwin] was in this hour-long consultation before the plea was entered. And Mr. Altounian indicated there was nothing discussed there about imperfect self-defense. And Mr. Smurr basicallywell, Mr. Smurr testified he didn't discuss this.
"And theand even had he, I don't think that without a great deal of explanation that [Edwin]this is something that [Edwin] at that time, at least, would have been able to comprehend at one short session."
The court further found Edwin's plea was not voluntary because of the influence his similarly-unadvised family had on him. The court stated:
"The Court further finds that [Edwin] was quite dependent on his family for emotional succor and stability. And, for whatever reason, I think as an objective matter, the People made it clear that they intended to proceed to trial and were not going to submit this on the evidence of the written psychiatric reports. So I don't fault the People for creating a misimpression.
"But I do think that it is still factually true that [Edwin]'s mother, and perhaps his father as well, were under the belief that the essential thing for [Edwin]'s best interest was to get him into a mental hospital and that hethe evidence was all in his favor and that a result of the trial could not be other than a not guilty by reason of insanity decision.
"And thethat problem, that view of the evidence tended to infect, I think, [Edwin]'s understanding of what was happening as well, because he relied on them. And it didn't leave room on their part to discuss with him themselves to the extent that they might have because it certainly was never discussed with them this concept of imperfect self-defense and the risks of going to trial and risking a first degree murder conviction, should that not have been found believable in the minds of the jury as opposed to accepting a second degree murder offer, which was the offer made.
"But, in any event, the fact is that the plea must be knowingly, intelligently, and voluntarily made by [Edwin]. And ... I'm making these findings and comments ... with respect to [Edwin]'s family, because there's a great deal of evidence that ... their thinking was influential on [Edwin], and he was eager to please them as well.
"So I think that that tended to infect the voluntariness of the plea because heand that their knowledge tended to become his knowledge in that sense."

DISCUSSION

I.

Standard of Review
Where, as here, a trial court has granted a petition for writ of habeas corpus *786 following an evidentiary hearing and the People have appealed, this court
"applies the substantial evidence test to the trial court's resolution of pure questions of fact and independently reviews questions of law, such as the selection of the controlling rule. With respect to mixed questions of law and fact, this court reviews the trial court's application of law to fact under a deferential clearly erroneous standard if the inquiry is predominantly factual. But when the application of law to fact is predominantly legal, such as when it implicates constitutional rights and the exercise of judgment about the values underlying legal principles, this court's review is de novo. [Citations.]" (In re Collins (2001) 86 Cal.App.4th 1176, 1181, 104 Cal.Rptr.2d 108; see also In re Pratt (1999) 69 Cal.App.4th 1294, 1314, 82 Cal. Rptr.2d 260.)
Whether Edwin or his parents were advised of imperfect self-defense is a question of fact. Whether his plea was knowing, intelligent, and voluntary in the absence of that advice, however, is a mixed question of law and fact that is predominantly legal, since "`the inquiry requires a critical consideration, in a factual context, of legal principles [concerning the concept of imperfect self-defense] and their underlying values....'" (In re Pratt, supra, 69 Cal.App.4th at p. 1314, 82 Cal.Rptr.2d 260.) Accordingly, we accept the trial court's resolution of evidentiary conflicts when supported by substantial evidence, independently assess the uncontradicted facts, and independently apply the law to the facts. (See In re Carpenter (1995) 9 Cal.4th 634, 646-647, 38 Cal.Rptr.2d 665, 889 P.2d 985.)

II.

Voluntariness of the Plea
Although Edwin sought to set aside his plea by means of a petition for writ of habeas corpus (apparently because certain of his other claims could only be brought in such a manner), the court and parties treated the matter as a standard motion to withdraw the plea or set aside the judgment. We shall do the same.
Pursuant to section 1018, a defendant who seeks to withdraw a guilty (or no contest) plea may do so before judgment has been entered, or within six months after an order granting probation is made if entry of judgment is suspended, upon a showing of good cause. "Although section 1018 is limited on its face to the period before judgment, the courts have long permitted defendants to move to set aside the judgment as a means of allowing the defendant to withdraw the guilty plea after judgment." (People v. Castaneda (1995) 37 Cal.App.4th 1612, 1617, 44 Cal.Rptr.2d 666.) Grounds for postjudgment withdrawal of a plea are essentially identical to those required under the statute and include mistake, ignorance, duress, fraud, or any other factor overcoming the exercise of free judgment. (Ibid.; People v. Superior Court (Giron) (1974) 11 Cal.3d 793, 797, 114 Cal.Rptr. 596, 523 P.2d 636.)
Here, the trial court found that Edwin's plea was not knowingly, intelligently, and voluntarily made because Edwin was ignorant of a potentially meritorious defense to second degree murderimperfect self-defense. The trial court found Edwin's ignorance was due to a number of factors: (1) his attorney failed to advise him of the possibility of asserting imperfect self-defense; (2) even if he was so advised, his mental state prevented him from understanding the concept; (3) the trial court failed to ask Edwin, while taking his plea, whether his attorney had discussed possible defenses with him; and (4) his family failed to advise him of the possibility of *787 asserting imperfect self-defense because they were never so advised.
"The entry of a plea must be a `"voluntary and intelligent choice among the alternative courses of action open to the defendant." [Citations.]' (Hill v. Lockhart (1985) 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203.)" (In re Vargas (2000) 83 Cal.App.4th 1125, 1133, 100 Cal.Rptr.2d 265.) We have held that a plea of guilty is not knowingly and intelligently made when a defendant does not have knowledge of a potentially meritorious defense prior to entering the plea. (People v. Harvey (1984) 151 Cal.App.3d 660, 668-671, 198 Cal.Rptr. 858 (Harvey); see also In re Williams (1969) 1 Cal.3d 168, 177, 81 Cal.Rptr. 784, 460 P.2d 984 (Williams).) In Harvey, defense counsel failed to advise the defendant of evidence which was vital to her defense. (People v. Harvey, supra, 151 Cal.App.3d at p. 671, fn. 3, 198 Cal.Rptr. 858.) We concluded that "[defendant cannot be said to have bargained away her right to have a trier of fact evaluate ... testimony when she did not know what that testimony would be. Other factors which might dilute or enhance the weight of such anticipated testimony were not for defense counsel, alone and in secret, to evaluate without discussion with defendant." (Id. at p. 670, 198 Cal.Rptr. 858.) Similarly, in Williams, upon which Harvey relied, the California Supreme Court determined that a defendant could not have bargained away a particular defense when he was not aware of it, and noted that it was defense counsel's obligation to inform the client of the crucial defense. (In re Williams, supra, 1 Cal.3d at p. 177, 81 Cal.Rptr. 784, 460 P.2d 984.)
Williams and Harvey stand for the proposition that a defense attorney is obligated to inform his or her client about any potentially meritorious defense prior to the client entering a guilty or no contest plea. While we recognize that imperfect self-defense is not a true defense, but instead is "a shorthand description of one form of voluntary manslaughter" (People v. Barton (1995) 12 Cal.4th 186, 200, 47 Cal.Rptr.2d 569, 906 P.2d 531), it closely resembles an affirmative defense (People v. Rios (2000) 23 Cal.4th 450, 464, 97 Cal.Rptr.2d 512, 2 P.3d 1066); hence, the logic of Williams and Harvey applies. Accordingly, we must determine whether, under the circumstances of this case, Edwin could have relied on the concept of imperfect self-defense in order to argue that he was guilty of no more than voluntary manslaughter.

III.

Imperfect Self-Defense Cannot Be Based on Delusion Alone
"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (In re Christian S. (1994) 7 Cal.4th 768, 771, 30 Cal.Rptr.2d 33, 872 P.2d 574 (Christian S.); see, e.g., People v. Flannel (1979) 25 Cal.3d 668, 674, 160 Cal.Rptr. 84, 603 P.2d 1 (Flannel); People v. Curtis (1994) 30 Cal.App.4th 1337, 1354, 37 Cal. Rptr.2d 304.) Here, the evidence offered at the evidentiary hearing in support of Edwin's claim of imperfect self-defense showed that Edwin's alleged belief in the need to defend himself from imminent peril arose solely from his mental delusions and paranoia.[5] The issue thus presented *788 here is whether a belief that one is in danger of imminent harm, founded upon a delusion alone, can support a claim of imperfect self-defense.
California follows the test of insanity laid down in M'Naughton's Case (1843) 8 Eng.Rep.R. 718, under which the accused must have been "incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).)[6] It has long been the rule in California that "insanity may not be used as a basis for extending leniency. It is either a complete defense, or none at all. There is no degree of insanity which may be established to affect the degree of crime." (People v. Cordova (1939) 14 Cal.2d 308, 311, 94 P.2d 40.) Thus, "`there is no degree of insanity sufficient to acquit of murder but not of manslaughter.'" (People v. Phillips (1929) 102 Cal.App. 705, 708, 283 P. 821.)
At least in part to "ameliorate the law governing criminal responsibility" prescribed by the M'Naughton rule (People v. Nicolaus (1967) 65 Cal.2d 866, 877, 56 Cal.Rptr. 635, 423 P.2d 787, disapproved on other grounds in People v. Wetmore (1978) 22 Cal.3d 318, 323-325 & fn. 5, 149 Cal.Rptr. 265, 583 P.2d 1308), two separate and independent, although occasionally overlapping, doctrines emerged: diminished capacity and imperfect self-defense (see People v. Saille (1991) 54 Cal.3d 1103, 1109-1111, 2 Cal.Rptr.2d 364, 820 P.2d 588 [reviewing history of diminished capacity doctrine]; People v. Flannel, supra, 25 Cal.3d at pp. 675-677, 160 Cal.Rptr. 84, 603 P.2d 1 [reviewing history of imperfect self-defense doctrine]). Under the diminished capacity doctrine, "evidence of diminished mental capacity, whether caused by intoxication, trauma, or disease, [could] be used to show that a defendant did not have a specific mental state [including malice] essential to an offense." (People v. Conley (1966) 64 Cal.2d 310, 316, 49 Cal. Rptr. 815, 411 P.2d 911.) Under the doctrine of imperfect self-defense, as previously described, a defendant can seek to negate malice by introducing evidence that he or she actually, albeit unreasonably, believed it was necessary to defend him- or herself from imminent peril to life or great bodily injury. (People v. Flannel, supra, 25 Cal.3d at p. 674, 160 Cal.Rptr. 84, 603 P.2d 1.)
*789 For the most part, the cases construing these doctrines distinguish, at least implicitly, between absence of a specific state of mind due to mental disease or defect (diminished capacity) and unreasonable belief in a state of facts (imperfect self-defense). (Compare diminished capacity cases such as People v. Wetmore, supra, 22 Cal.3d at pp. 321-324, 149 Cal.Rptr. 265, 583 P.2d 1308 [defendant's evidence, establishing he entered apartment under delusion he owned it, admissible at guilt phase to show he lacked specific intent necessary for burglary, despite the fact such evidence was also probative of insanity]; People v. Poddar (1974) 10 Cal.3d 750, 758-760, 111 Cal.Rptr. 910, 518 P.2d 342 [defendant was paranoid schizophrenic; in context of implied malice, defendant, even if aware of duty to act in accordance with law, must also be able to act in accordance with that duty]; People v. Nicolaus, supra, 65 Cal.2d at p. 877, 56 Cal.Rptr. 635, 423 P.2d 787 [defendant, who had long-standing mental problems, decided to bring his children to an extreme state of happiness and kill them; if defendant was legally sane but suffered from a mental illness that prevented his acting with malice aforethought or premeditation and deliberation, he could not be convicted of first degree murder]; People v. Conley, supra, 64 Cal.2d at pp. 318, 322, 49 Cal.Rptr. 815, 411 P.2d 911 [defendant was intoxicated; malice aforethought can be negated by showing person who intentionally killed was incapable of harboring malice due to mental disease or defect or intoxication, as mental component of malice requires that defendant be aware of obligation to act within the law]; People v. Gorshen (1959) 51 Cal.2d 716, 726-727, 731-733, 336 P.2d 492 (disapproved on other grounds in People v. Lasko (2000) 23 Cal.4th 101, 110, 96 Cal.Rptr.2d 441, 999 P.2d 666 & People v. Wetmore, supra, 22 Cal.3d at pp. 323-325 & fn. 5, 149 Cal.Rptr. 265, 583 P.2d 1308) [defendant was intoxicated and suffering from mental disease; diminished capacity evidence properly admitted not as complete defense negating capacity to commit any crime, but as partial defense negating specific mental state essential to particular crime; murder can be reduced to manslaughter not only on statutory basis of provocation, but also on subjective standard of voluntary intoxication or mental impairment]; People v. Duckett (1984) 162 Cal.App.3d 1115, 1118-1119, 1126 & fn. 4, 209 Cal.Rptr. 96 [defendant, a paranoid schizophrenic, believed one victim was the devil and the other a witch, and he heard auditory command hallucinations telling him one victim was going to kill him or have him killed; even though defendant apparently felt he had to kill to protect himself, case was tried only on theory of diminished capacity (and insanity), not on theory of imperfect self-defense]; People v. Lee (1979) 92 Cal.App.3d 707, 711-712, 155 Cal.Rptr. 128 [defendant, who killed victim during attempted sexual assault, had delusional system focused on belief people were trying to kill him and victim was part of ambush, so defendant thought he had to protect himself; offense could be no greater than manslaughter under diminished capacity if mental illness precluded defendant from entertaining malice] with imperfect self-defense cases such as In re Christian S., supra, 7 Cal.4th at pp. 772, 784, 30 Cal.Rptr.2d 33, 872 P.2d 574 [defendant shot and killed individual whose friends had verbally and physically threatened defendant, and who, when shot, was chasing and threatening defendant; case remanded for finding whether defendant held actual belief of imminent harm]; People v. Flannel, supra, 25 Cal.3d at pp. 673-674, 681, 160 Cal.Rptr. 84, 603 P.2d 1 [defendant shot and killed victim after victim either pulled a knife or defendant believed he was pulling a knife; manslaughter would have been appropriate verdict]; *790 Roads v. Superior Court (1969) 275 Cal. App.2d 593, 595-597 & fn. 2, 80 Cal.Rptr. 169 [victim forced his way into defendant's house and menaced defendant despite warnings defendant would shoot, and @when victim lunged at defendant, gun discharged, killing victim; prosecutor's failure to produce sufficient evidence of murder did not necessarily establish justifiable homicide since jury could find manslaughter based on lack of reasonable belief]; People v. Lewis (1960) 186 Cal. App.2d 585, 593-594, 598, 9 Cal.Rptr. 263 [defendant struck victim with hatchet in response to assault with firearm; defendant entitled to voluntary manslaughter instructions on imperfect self-defense theory as jury could have found he acted under influence of fear not reasonably justified by circumstances]; People v. Best (1936) 13 Cal.App.2d 606, 608-610, 57 P.2d 168 [verbal altercation grew physical and when victim came after defendant, defendant struck him in head, causing fatal blood clot; voluntary manslaughter appropriate where act committed under influence of uncontrollable fear of death or great bodily harm, caused by the circumstances, but such belief unreasonable].)
Even People v. Wells (1949) 33 Cal.2d 330, 202 P.2d 53 (disapproved on other grounds in People v. Wetmore, supra, 22 Cal.3d at pp. 323-325 & fn. 5, 149 Cal. Rptr. 265, 583 P.2d 1308), which represents an early step in the development of both diminished capacity (People v. Saille, supra, 54 Cal.3d at p. 1109, 2 Cal.Rptr.2d 364, 820 P.2d 588) and imperfect self-defense (In re Christian S., supra, 7 Cal.4th at p. 776, 30 Cal.Rptr.2d 33, 872 P.2d 574; People v. Flannel, supra, 25 Cal.3d at p. 675, 160 Cal.Rptr. 84, 603 P.2d 1), involved a belief which, although skewed by mental illness, was nevertheless factually based. In that case, the defendant suffered from a condition in which his body and mind were in a state of high sensitivity to external stimuli, causing him to react abnormally to situations and such stimuli. His threshold of fear was lower than that of an ordinary person, so that stimuli which would normally not cause fear would cause fear in him. (People v. Wells, supra, 33 Cal.2d at pp. 344-345, 202 P.2d 53.) Under the circumstances, the California Supreme Court held he should have been permitted to introduce evidence, against a charge requiring malice aforethought, that because of his abnormal condition he acted not with malice, but under a genuine fear for his safety and a belief he was defending himself from attack. (Id. at p. 344, 202 P.2d 53.) The court pointed out that if the defendant acted only under fear of bodily harm and in the genuine, although unreasonable, belief he was defending himself against such harm by the use of a necessary amount of force, he would not be guiltless, but also would not be guilty of the crime charged because an essential elementmalice aforethoughtwas lacking. (Id. at p. 345, 202 P.2d 53.) In Wells, however, the defendant was not suffering from a delusion, but from an abnormal reaction to reality.
Diminished capacity was eliminated by the Legislature in 1981[7] and by voter initiative in 1982.[8] (See People v. Saille, *791 supra, 54 Cal.3d at pp. 1111-1112, 2 Cal. Rptr.2d 364, 820 P.2d 588.) However, "diminished actuality" remains a viable concept. While the Legislature, in eliminating the diminished capacity defense, "precluded jury consideration of mental disease, defect, or disorder as evidence of a defendant's capacity to form a requisite criminal intent, ... it did not preclude jury consideration of mental condition in deciding whether a defendant actually formed the requisite criminal intent." (People v. Williams (1997) 16 Cal.4th 635, 677, 66 Cal.Rptr.2d 573, 941 P.2d 752; see People v. Coddington (2000) 23 Cal.4th 529, 583, 97 Cal.Rptr.2d 528, 2 P.3d 1081, overruled on other grounds in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal.Rptr.2d 409, 25 P.3d 618; People v. Hernandez (2000) 22 Cal.4th 512, 520, 93 Cal.Rptr.2d 509, 994 P.2d 354.)
Even the concept of diminished actuality is circumscribed, however. As the California Supreme Court explained in People v. Saille, supra, 54 Cal.3d 1103, 2 Cal.Rptr.2d 364, 820 P.2d 588, the law no longer "permits a reduction of what would otherwise be murder to nonstatutory voluntary manslaughter due to voluntary intoxication and/or mental disorder." (Id. at p. 1107, 2 Cal.Rptr.2d 364, 820 P.2d 588, fn. omitted.) Saille recognized that sections 25, 28, and 29, while removing a defendant's ability to use evidence of a mental disorder to negate the capacity to form a requisite mental state, do permit such evidence on the issue of whether the accused actually formed the required mental state. (People v. Saille, supra, 54 Cal.3d at pp. 1111-1112, 2 Cal.Rptr.2d 364, 820 P.2d 588.) Those statutes, however, must be read in conjunction with the definition of malice contained in section 188, which was amended as part of the same legislation that abolished diminished capacity. Section 188, which defines malice vis-à-vis section 187's definition of murder as "the unlawful killing of a human being ... with malice aforethought" (id., subd. (a)), provides:
"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.
"When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."
The Supreme Court found that the first sentence of the second paragraph limits malice to the definition contained in section 188, so that "once the trier of fact finds a deliberate intention unlawfully to kill, no other mental state need be shown to establish malice aforethought. Whether a defendant acted with a wanton disregard for human life or with some antisocial motivation is no longer relevant to the issue of express malice. [Citation.]" (People v. Saille, supra, 54 Cal.3d at pp. 1113-1114, 2 Cal.Rptr.2d 364, 820 P.2d 588.) Since malice aforethought is established once an intentional killing is shown, the concept of *792 "`diminished capacity voluntary manslaughter,' " i.e., nonstatutory manslaughter, is no longer valid.[9] (Id. at p. 1114, 2 Cal.Rptr.2d 364, 820 P.2d 588.) Section 192, however, still negates malice when an intentional killing results from a sudden quarrel or heat of passion induced by adequate provocation. (People v. Saille, supra, 54 Cal.3d at p. 1114, 2 Cal.Rptr.2d 364, 820 P.2d 588.) In reconciling section 188's definition of malice with the language of sections 22, subdivision (b) and 28, subdivision (a) (which made evidence of voluntary intoxication and mental illness admissible solely on the issue of whether the accused "`actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged'"), the court noted that sections 22 and 28 apply to any crime, whereas section 188 defines malice for purposes of murder. (People v. Saille, supra, 54 Cal.3d at pp. 1112, 1115-1116, 2 Cal.Rptr.2d 364, 820 P.2d 588.) "In combination, the statutes provide that voluntary intoxication or mental condition may be considered in deciding whether there was malice as defined in section 188." (Id. at p. 1116, 2 Cal.Rptr.2d 364, 820 P.2d 588.) Since section 188 equates express malice with intent unlawfully to kill,[10] a defendant "is still free to show that because of his mental illness or voluntary intoxication, he did not in fact form the intent unlawfully to kill (i.e., did not have malice aforethought). [Citation.]" (People v. Saille, supra, 54 Cal.3d at pp. 1116-1117, 2 Cal. Rptr.2d 364, 820 P.2d 588.)
Assuming Edwin intended to kill Burrow, he was not entitled, under Saille, to use his mental illness to reduce the offense from murder to manslaughter unless he could do so under an imperfect self-defense theory.
Despite Saille's reasoning concerning the definition of malice set out in section 188, which would appear to be equally applicable to the imperfect self-defense doctrine (see In re Christian S., supra, 7 Cal.4th at pp. 792-795, 30 Cal. Rptr.2d 33, 872 P.2d 574 (dis. opn. of Lucas, C.J.)), that doctrine remains viable, untouched by the abolition of diminished capacity (In re Christian S., supra, 7 Cal.4th at p. 771, 30 Cal.Rptr.2d 33, 872 P.2d 574). In Christian S., the state Supreme Court found no indication in the 1981 amendments to the Penal Code that the Legislature intended to eliminate imperfect self-defense along with diminished capacity, and it rejected the notion that the two concepts were so closely related that when the Legislature eliminated one, it necessarily also eliminated the other. (Id. at pp. 774-778, 30 Cal.Rptr.2d 33, 872 P.2d 574.) The court explained:
"The two doctrines relate to the concept of malice, but the similarity ends there. Unlike diminished capacity, imperfect self-defense is not rooted in any notion of mental capacity or awareness of the need to act lawfully. To the contrary, a person may be entirely free of any mental disease, defect, or intoxication and may be fully aware of the need to act lawfullyand thus not have a diminished capacitybut actually, although unreasonably, believe in the need for self-defense. Put simply, an awareness of the need to act lawfully does notin fact *793 or logicdepend on whether the putative victim's belief in the need for selfdefense is correct. A person who actually believes in the need for self-defense necessarily believes he is acting lawfully. He is thus aware of the obligation to act lawfully. A defendant could assert one doctrine even though the facts did not support the other. The diminished-capacity defense could beand often has beenasserted when self-defense was not an issue; and, conversely, imperfect self-defense could be raised when there was no claim of diminished capacity." (Id. at pp. 777-778, 30 Cal.Rptr.2d 33, 872 P.2d 574.)
The court further found that imperfect self-defense was not eliminated by the language added to section 188 in 1981. (In re Christian S., supra, 7 Cal.4th at p. 778, 30 Cal.Rptr.2d 33, 872 P.2d 574.) Seemingly contrary to the interpretation given the statutory phrase "deliberate intention unlawfully to take away the life" in Saille (see People v. Saille, supra, 54 Cal.3d at pp. 1114-1115, 2 Cal.Rptr.2d 364, 820 P.2d 588), the Christian S. court determined that "unlawfully" modifies "intention" so that the statute requires an intent to act unlawfully, i.e., the defendant must have a wrongful intent. (In re Christian S., supra, 7 Cal.4th at p. 778, 30 Cal.Rptr.2d 33, 872 P.2d 574.)[11] The court noted: "A person who actually believes in the need for self-defense necessarily believes he is acting lawfully." (Ibid.) Thus, "[w]hen the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and cannot be convicted of murder." (Id. at p. 783, 30 Cal. Rptr.2d 33, 872 P.2d 574.)[12]
Although Christian S. settled the question of the imperfect self-defense doctrine's viability following the elimination of the diminished capacity defense, neither it nor any subsequent Supreme Court opinions suggest this "narrow" doctrine (In re Christian S., supra, 7 Cal.4th at p. 783, 30 Cal.Rptr.2d 33, 872 P.2d 574) now covers aspects of diminished capacity or diminished actuality not previously included. Thus, imperfect self-defense remains a species of mistake of fact (see id. at p. 779, fn. 3, 30 Cal.Rptr.2d 33, 872 P.2d 574); as such, it cannot be founded on delusion. In our view, a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality. A person acting under a delusion is not negligently interpreting actual facts; instead, he or she is out of touch with reality. That may be insanity, but it is not a mistake as to any fact.
At least insofar as general intent crimes are concerned, it is settled that a mistake-of-fact defense, pursuant to section 26, subdivision Three,[13] cannot be *794 predicated upon delusions which are the product of mental illness. (People v. Castillo (1987) 193 Cal.App.3d 119, 124-125, 238 Cal.Rptr. 207; People v. Gutierrez (1986) 180 Cal.App.3d 1076, 1083, 225 Cal. Rptr. 885.) We fail to see why the rule should be any different simply because we are considering a specific intent crime or a mistake-of-fact defense under section 188. As noted in Gutierrez, a mentally ill defendant who suffers from a delusion may represent a continuing threat and "may be blameworthy to some degree, although perhaps not as much as a completely sane individual. The position of the mentally ill defendant has been accommodated by providing for the NGI plea, by allowing evidence of mental illness to prove the absence of specific intent, and by permitting consideration of mental illness as a mitigating factor for sentencing purposes." (People v. Gutierrez, supra, 180 Cal. App.3d at p. 1084, 225 Cal.Rptr. 885.)
Edwin contends Flannel specifically concluded the basis for a defendant's actual belief is irrelevant, by stating, "No matter how the mistaken assessment is made, an individual cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard." (People v. Flannel, supra, 25 Cal.3d at p. 679, 160 Cal.Rptr. 84, 603 P.2d 1.) This statement, however, relied on the expanded mental component of malice construed and applied in People v. Conley, supra, 64 Cal.2d 310, 49 Cal.Rptr. 815, 411 P.2d 911, which established the defense of diminished capacity. As the California Supreme Court has since recognized, this portion of Flannel's reasoning is no longer valid due to the abolition of diminished capacity. (In re Christian S., supra, 7 Cal.4th at p. 777, 30 Cal.Rptr.2d 33, 872 P.2d 574.) Moreover, we note that Flannel was not dealing with the case of a delusional defendant.
Edwin also contends that since section 28 specifically allows evidence of mental illness at the guilt phase, where relevant to show that the accused did not harbor malice aforethought, the Legislature specifically authorized evidence of delusions to support an imperfect self-defense claim. This argument fails for two reasons. First, our conclusion that a delusion, unsupported by any basis in reality, cannot sustain an imperfect self-defense claim, does not preclude all mentally-ill defendants from using evidence of mental illness to assert imperfect self-defense. We are dealing in this case only with a mental aberration rising to the level of delusion and a killing which results solely from that delusion, and nothing we say should be read any more broadly.
Second, section 28 has no impact on the imperfect self-defense doctrine. The court in Christian S. specifically found that the Legislature intended no change in the doctrine of imperfect self-defense when it enacted the 1981 legislationincluding section 28which abolished diminished capacity. (In re Christian S., supra, 7 Cal.4th at p. 775, 30 Cal.Rptr.2d 33, 872 P.2d 574.) Since the cases upon which imperfect self-defense is founded show no intent to have the doctrine apply in situations where there are no facts to support the defendant's belief in the need to use self-defense, our conclusion the doctrine cannot be used by Edwin merely follows the law that was in effect when Flannel was decided. Since the Legislature intended no change in that law, section 28 has no effect on the doctrine.
It is true that the legislative history of the 1981 statutory changes stated that, following those changes, "`to reduce murder to manslaughter, except in the delusional self-defense kinds of cases, there will have to be a showing of provocation, *795 the traditional basis of manslaughter, to reduce murder to manslaughter.' [Citation.]" (In re Christian S., supra, 7 Cal.4th at p. 781, 30 Cal.Rptr.2d 33, 872 P.2d 574.) This statement does not persuade us that the Legislature intended imperfect self-defense to apply to cases where the defendant's actual belief is unsupported by any factual basis, since the legislative history suggests the Legislature did not even consider the question of imperfect self-defense.[14] (Id. at pp. 781-782, 30 Cal.Rptr.2d 33, 872 P.2d 574.)
The cases Edwin cites to support his contention that "a claim of `delusional self defense' may be based upon any type of mental illness" do not alter our conclusion as each, with the exception of People v. Webber (1991) 228 Cal.App.3d 1146, 279 Cal.Rptr. 437, reveals the existence of some facts to support the defendant's actual belief in the need to use deadly force. Thus, in People v. Hardin (2000) 85 Cal. App.4th 625, 631-632, 102 Cal.Rptr.2d 262, the defendant killed an elderly woman after he refused to leave her residence and she threatened him with a hammer. In DePetris v. Kuykendall (9th Cir.2001) 239 F.3d 1057, 1058-1060, the defendant, after suffering years of abuse, killed her husband while he was asleep in bed. In Seidel v. Merkle (9th Cir.1998) 146 F.3d 750, 752, the defendant killed while involved in a fight.
People v. Webber, supra, 228 Cal.App.3d 1146, 279 Cal.Rptr. 437, does not assist Edwin. In that case, there apparently was no factual basis to support the defendant's belief that he was going to be the victim of a drive-by shooting and therefore had to shoot into a car traveling on a street next to the vehicle in which he was riding. Although the defendant proffered imperfect self-defense at trial, the issue raised on appeal was whether he was entitled to an instruction on involuntary manslaughter. (Id. at pp. 1154-1155, 1160-1165, 279 Cal.Rptr. 437.) As the Court of Appeal had no occasion to determine whether a delusion alone could support an imperfect self-defense claim, the case cannot stand for such a proposition.
In People v. Uriarte (1990) 223 Cal. App.3d 192, 272 Cal.Rptr. 693, the defendant, who sometimes suffered from hallucinations due to his drug and alcohol abuse, killed his neighbors in the delusional belief they were holding his wife hostage. (Id. at pp. 194-196, 272 Cal.Rptr. 693.) On appeal, he contended the trial court erred by refusing to instruct the jury that he was guilty of voluntary manslaughter, not murder, if, as a result of his delusional mental state, he honestly but unreasonably believed the killings were necessary to prevent imminent great bodily injury to his wife. (Id. at pp. 196-197, 272 Cal.Rptr. 693.) As the Court of Appeal found insufficient evidence to support the doctrine of imperfect self-defense (id. at pp. 197-198, 272 Cal.Rptr. 693), its statement that the defendant's theory for requesting such an instruction was correct (id, at p. 197, 272 Cal.Rptr. 693), is dictum. Moreover, it is dictum with which we disagree: the cases which form the basis of the imperfect self-defense doctrine, and which are cited in Flannel, state that the defendant's belief must be "caused by the circumstances." (See, e.g., People v. Lewis, supra, 186 Cal. App.2d at p. 598, 9 Cal.Rptr. 263; People v. Best, supra, 13 Cal.App.2d at pp. 609-610, 57 P.2d 168.) When there are no *796 circumstances to support the belief, the doctrine does not apply.
In People v. Scott (1983) 146 Cal.App.3d 823, 194 Cal.Rptr. 633, Division Two of the Fourth District Court of Appeal considered a case in which the defendant was convicted of attempted vehicle theft.[15] The defendant was at a party and became involuntarily intoxicated to the point of hallucination after someone apparently spiked the punch. While in this state, he appropriated two vehicles, apparently believing he was a government agent who was trying to save his own life or possibly that of the President. (Id. at pp. 826-829, 194 Cal.Rptr. 633.) At trial, the defendant asserted a diminished capacity defense in order to negate the specific intent requirement of the vehicle theft statute. On appeal, the court declined to discuss diminished capacity, finding instead that no crime was committed pursuant to subdivision Three of section 26. The court found the defendant acted under a mistake of fact in that he believed he was a government agent who was acting to protect his own life or that of the President; where mistake of fact is concerned, guilt or innocence is determined as if the facts were as the accused perceived them; had the facts been as the defendant perceived them, his actions would have been legally justified under the doctrine of necessity; and, although the defendant's mistake of fact was irrational, it was reasonable under the circumstances of his having been involuntarily intoxicated with a hallucinogenic substance. (People v. Scott, supra, 146 Cal. App.3d at pp. 831-832, 194 Cal.Rptr. 633.)
The Scott court itself has cautioned that the case holding is limited to the facts presented therein. (People v. Gutierrez, supra, 180 Cal.App.3d at p. 1083, 225 Cal. Rptr. 885.) Those facts are not presented here and, whatever the merits of the court's reasoning with regard to those facts, we do not find it applicable to Edwin's situation.
Courts in other states have held that defendants whose belief in the need to use self-defense stems entirely from mental delusions and paranoia, cannot avail themselves of the doctrine of imperfect self-defense. For example, in State of Kansas v. Ordway (1997) 261 Kan. 776, 934 P.2d 94, the Kansas Supreme Court held that its statutory version of imperfect self-defense, which provides that voluntary manslaughter is the intentional killing of a human being "upon an unreasonable but honest belief that circumstances existed that justified deadly force" (id. at p. 100), does not apply "where a defendant raises the defense of insanity, and more specifically, the `unreasonable but honest belief necessary to support the `imperfect right to self-defense manslaughter' cannot be based upon a psychotic delusion." (Id. at p. 104.) The court based its conclusion on the absence of any express indication the legislature contemplated an unreasonable belief might be based on psychotic delusions, the absence in Kansas case law of any indication that application of imperfect self-defense to cases where the defendant denied criminal responsibility due to mental illness was envisioned, and an Illinois case in which the court interpreted a similar statute as not intending an "unproved insanity defense" to be a mitigating factor in the crime of second degree murder. (Id. at pp. 103-104.)
In Commonwealth v. Sheppard (1994) 436 Pa.Super. 584, 648 A.2d 563, the court held that trial counsel was not ineffective *797 for failing to assert imperfect self-defense at trial where the defendant's belief in the need for self-defense arose from his paranoid mental state, and there was no objective basis for a subjective, although unreasonable, belief the defendant was in danger and acted in self-defense. (Id. at pp. 567, 570.) In so holding, the court interpreted its statutory provision of imperfect self-defense, which states in part that "[a] person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing ... but his belief is unreasonable." (18 Pa.C.S.A. § 2503(b); Commonwealth v. Sheppard, supra, 648 A.2d at p. 569.)
In Peterson v. State of Maryland (1994) 101 Md.App. 153, 643 A.2d 520, the Maryland appellate court concluded, under Maryland case law which established that a defendant was guilty of voluntary manslaughter based on imperfect self-defense "if the jury concluded that the defendant honestly believed that the use of force was necessary but that this subjective belief was unreasonable under the circumstances," that an "imperfect self-defense instruction should not be given unless the evidence generates the issue of whether, under the circumstances, the defendant was entitled to take some action against the victim." (Id. at p. 522.) The court observed that in every Maryland case holding imperfect self-defense had been shown, the evidence was sufficient to support a reasonable conclusion the defendant was entitled to take some action against the victim. By contrast, in every case holding imperfect self-defense was not shown, the evidence was insufficient to support a reasonable conclusion the defendant was entitled to take any action against the victim. (Id. at pp. 522-523.)
Finally, in State v. Seifert (1990) 155 Wis.2d 53, 454 N.W.2d 346, the Wisconsin Supreme Court, interpreting its imperfect self-defense statute that provides for "imperfect self-defense manslaughter" when a defendant causes death "[u]nnecessarily, in the exercise of his privilege of self-defense or defense of others or the privilege to prevent or terminate the commission of a felony," held that imperfect self-defense was "never intended to cover situations ... where it is entirely the defendant's mental disease or defect, not an error in judgment or perception or a negligently-formed perspective of the situation, that motivates the defendant's actions." (Id. at pp. 349-350, 352, fn. omitted.) The court explained "that unnecessary or unreasonable acts in the context of imperfect self-defense manslaughter refer to acts resulting from an error in judgment or perception in contrast to the acts of a person of ordinary intelligence and prudence, not to acts resulting from a complete absence of reason and rational thought." (Id. at p. 352, fn. 5.) The court concluded that "when a defendant's unlawful actions are totally the product of the defendant's mental illness, the law relieves the defendant of criminal responsibility for those actions" by a finding of not guilty by reason of mental disease or defect. (Id. at p. 353.)
While the statutory schemes differ in these other states, the reasoning in the cited cases applies with equal force here. That reasonableness is even an issue in determining whether a defendant acted in imperfect self-defense implies the defendant must be able to evaluate the facts as a reasonable person. When a defendant's belief in the need to use self-defense is based entirely on delusions, the defendant does not have a belief based on a reasonable perception of the circumstances. Instead, such a defendant's actions show he or she is entirely incapable of reasoning, comprehending, or judging the nature of *798 the situation. As the courts found in State of Kansas v. Ordway, supra, 261 Kan. 776, 934 P.2d 94 and State v. Seifert, supra, 155 Wis.2d 53, 454 N.W.2d 346, an unreasonable belief cannot be based on a psychotic delusion.
Relying on People v. Tufunga (1999) 21 Cal.4th 935, 90 Cal.Rptr.2d 143, 987 P.2d 168, Edwin next contends that because imperfect self-defense is established as a recognized means of raising a reasonable doubt as to the existence of malice, its scope may not be narrowed or diminished except by legislative action. In Tufunga, the California Supreme Court held it was prohibited from abolishing the claim-of-right defense to robbery because the Legislature codified, in the current robbery statute, the common law recognition that the defense can negate the felonious intent-to-steal element of the crime. (Id at p. 950, 90 Cal.Rptr.2d 143, 987 P.2d 168.)
Tufunga has no application here. Edwin cites no authority, and we are aware of none, showing the Legislature recognized imperfect self-defense as a defense to murder by incorporating malice into the definition of the crime when it enacted the murder statutes in 1872, or that it otherwise codified the doctrine. To the contrary, the state Supreme Court has recognized that imperfect self-defense is a judicially-developed theory of voluntary manslaughter that is not expressed in the statutory scheme at all. (People v. Rios, supra, 23 Cal.4th at p. 465, 97 Cal.Rptr.2d 512, 2 P.3d 1066.) As explained in Christian S., because malice is a statutory requirement for a murder conviction, the statute required courts to determine whether an actual but unreasonable belief in the imminent need for self-defense rose to the level of malice within the statutory definition. (In re Christian S., supra, 7 Cal.4th at pp. 773-774, 30 Cal.Rptr.2d 33, 872 P.2d 574.) Moreover, since we are not eliminating imperfect self-defense, we are not expanding the statutorily-defmed mens rea of malice. Instead, we find nothing in the language of sections 187 and 188 that suggests the Legislature intended to extend imperfect self-defense claims to defendants whose actual belief in the need to use self-defense is based on a delusion. Therefore, we are free to interpret the doctrine of imperfect self-defense as being inapplicable to such defendants. In so doing, we neither create a new form of manslaughter nor eliminate a form which already exists. (See People v. Anderson (2002) 28 Cal.4th 767, 770, 122 Cal.Rptr.2d 587, 50 P.3d 368["[I]f a new form of manslaughter is to be created, the Legislature, not this court, should do it"].)
Edwin also argues that a rule barring delusion from supporting an imperfect self-defense claim, if applied to him, is unconstitutionally retroactive. In so doing, he relies on People v. Blakeley (2000) 23 Cal.4th 82, 91-92, 96 Cal.Rptr.2d 451, 999 P.2d 675 for the proposition that "`an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates in the same manner as an ex post facto law.'" In Blakeley, our Supreme Court concluded that an unintentional killing in unreasonable self-defense is voluntary manslaughter, but declined to apply this holding to the defendant because previous appellate decisions had uniformly held that such a killing was only involuntary manslaughter. (People v. Blakeley, supra, 23 Cal.4th at pp. 88-89, 92, 96 Cal.Rptr.2d 451, 999 P.2d 675.) Thus, ex post facto principles precluded the imposition of increased criminal liability to voluntary manslaughter for conduct that at the time was considered to be only involuntary manslaughter.
No similar ex post facto problem exists here. Unlike the situation in Blakeley, there is no uniform appellate rule interpreting *799 the doctrine of imperfect self-defense contrary to our holding that said doctrine cannot be based on delusion. Moreover, our opinion does not deprive Edwin of an affirmative defense which was available to him at the time he shot Burrow. (See Moss v. Superior Court (1998) 17 Cal.4th 396, 429-430, 71 Cal.Rptr.2d 215, 950 P.2d 59.)
Last, Edwin contends there are other bases for the trial court's decision beyond the failure to advise about imperfect self-defense. He argues that even if we find imperfect self-defense inapplicable to him, these other grounds are supported by substantial evidence and require invalidation of the plea.
The trial court's decision, and the granting of the writ petition, are centered on the court's conclusion Edwin was not advised of, and could not appreciate, a possible claim of imperfect self-defense. Since, as a matter of law, a claim of imperfect self-defense was not available to Edwin, it necessarily follows the lack of adviceeither to Edwin or his parents cannot have rendered his plea unknowing, unintelligent, or involuntary. Hence, the writ cannot be granted on this ground.
Edwin claims the record contains evidence that he merely intended to shoot Burrow; hence, there existed other defenses to second degree murder beyond imperfect self-defense. We express no opinion on the strength of that evidence. We note, however, that several bases for the writ were presented to the trial court, and evidence was presented thereon. We agree with Edwin's contention that the trial court never implicitly or explicitly ruled on the other possible grounds for relief. Accordingly, we will remand this matter for further proceedings, in order to permit the parties to argue, and the trial court to determine, whether the petition for writ of habeas corpus should be granted or denied based on the remaining grounds.

DISPOSITION
The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.
WE CONCUR: DIBIASO and CORNELL, JJ.
NOTES
[1] All statutory references are to the Penal Code unless otherwise stated.
[2] Pursuant to Evidence Code sections 452, subdivision (d) and 459, we take judicial notice of that opinion.
[3] Federal habeas proceedings were stayed pending the state court proceedings.
[4] During the pretrial conference, the court told the attorneys about an insanity case that was tried in Tulare County. In that case, an employee of a market was showering at his employer's house when he shot and killed the employer's girlfriend, who he thought had a weapon. The item turned out to be a can of hair spray.
[5] Mrs. Gregory testified that Edwin told her that he shot Burrow after thinking the Russians were directing Burrow to kill Edwin and his father before Burrow walked out of the meeting. Edwin said he knew that either Burrow was going to kill him or he was going to kill Burrow. Edwin told the same thing to Dr. Velosa, one of the psychiatrists appointed to determine Edwin's sanity at the time of the shooting. Edwin executed a declaration in which he stated that he believed Burrow was armed and about to shoot him and his father before leaving the residence. Terrell concluded, after examining Edwin in October 1993, that Edwin was acting in what he sincerely believed, "due to his paranoid and psychotic mental disorder," to be self-defense. No evidence was presented at the evidentiary hearing that Burrow engaged in any behavior which could have led Edwin to believe he was armed and about to shoot Edwin or his father. Burrow did not have a gun drawn and Edwin apparendy never saw Burrow with a gun. There was no evidence of prior episodes that would lead to a belief Burrow was a threat to Edwin or Dr. Gregory. While Edwin claims there was objective evidence to support his belief that Burrow was about to kill him or his fatherBurrow wore a shirt which, from its color, Edwin believed to be a bulletproof vest, and carried a briefcase, which Edwin believed contained a gunthese facts supported Edwin's belief only because of Edwin's delusion. They did not give his belief any basis in reality.
[6] The test is in the disjunctive, despite the literal wording of the statute. (People v. Skinner (1985) 39 Cal.3d 765, 769, 217 Cal.Rptr. 685, 704 P.2d 752.)
[7] Section 28, subdivision (a) provides in part: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state...." Subdivision (b) of the statute states: "As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action. . . ."
[8] Section 25, subdivision (a) states: "The defense of diminished capacity is hereby abolished. In a criminal action, ... evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."
[9] The court made clear it was not considering the imperfect-self-defense form of nonstatutory voluntary manslaughter. (People v. Saille, supra, 54 Cal.3d at p. 1107, fn. 1, 2 Cal. Rptr.2d 364, 820 P.2d 588.)
[10] "`The adverb "unlawfully" in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing recognized by the law. [Citation.]'" (People v. Saille, supra, 54 Cal.3d at p. 1115, 2 Cal.Rptr.2d 364, 820 P.2d 588, italics added.)
[11] The Christian S. court found no inconsistency with Saille. (In re Christian S., supra, 7 Cal.4th at pp. 779-780, 30 Cal.Rptr.2d 33, 872 P.2d 574.)
[12] An actual but unreasonable belief in the need to use deadly force in self-defense is deemed to negate malice essentially because the killer does not have an antisocial motive or evil state of mind. Under the plain language of section 188 as it has existed since 1981, however, when there is intent to kill, no other mental state need by shown to establish malice. Hence, the existence of an antisocial motive or evil state of mind is immaterial.
[13] Section 26 provides in part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] ... [¶] ThreePersons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."
[14] Indeed, if the word "delusional" were read literally, it could be argued the Legislature meant to eliminate nonstatutory manslaughter in all cases except those involving self-defense based on true delusions. Instead, it is apparent the reference is to unreasonable self-defense situations.
[15] Although the defendant originally entered an insanity plea, it was withdrawn, without trial, after he was granted summary probation. (People v. Scott, supra, 146 Cal.App.3d at p. 826, 194 Cal.Rptr. 633.)