[Crim. No. 6451. Fifth Dist. Feb. 2, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
NAOMI HARVEY, Defendant and Appellant.

662

---

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Lisa Short, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Roger E. Venturi and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HAMLIN, J.**—Defendant was charged with murder (Pen. Code, § 187) by personal use of a firearm (Pen. Code, § 12022.5).[1] While represented by the public defender, defendant pleaded guilty to second degree murder and admitted personal use of a firearm. The court sentenced defendant to state prison for 15 years to life plus 2 years for the firearm use.

Almost 11 months after she pleaded guilty, defendant moved, through a new attorney, to vacate her guilty plea and to set aside the judgment of conviction based thereon. The sentencing court determined it lacked jurisdiction to consider the motion. This court reversed with directions. Thereafter the trial court heard and denied defendant's motion. Defendant appealed and filed a certificate of probable cause.[2]

### THE FACTS

At the time of the offense to which she pleaded guilty, defendant was approximately 40 years old and had been an ordained minister since her late teens. In December 1979 she was employed by the Pentecostal Church of God in the State of Washington, where she lived in a small logging community. Although defendant was unmarried, she had raised more than a dozen children and adopted seven or eight of them. At the time of the offense, her youngest children were three and six years old.

Prior to her employment by the Pentecostal Church of God in the State of Washington, defendant traveled with a religious singing group and recorded several albums. Through this group she met Tommie Lou Morton. From about 1975 to the time of the offense, defendant had lived intermittently with Morton. Defendant had made a "death bed" promise to Morton's father to care for Morton. According to defendant, Morton had a history of psychological problems, as did Morton's sister, Ada Nation, who also lived with defendant in December 1979.

In 1976 Morton became reacquainted with the victim, Shipley, who knew both Morton and defendant through religious activities. Like defendant, Shipley was an ordained minister. Morton went to live with Shipley in Stockton, California. A stormy relationship among these three women ensued in the years between 1976 and the time of the offense. Morton lived

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] As no certificate of probable cause is required when an appeal is taken from the denial of a motion to set aside the judgment (*People v. Kraus* (1975) 47 Cal.App.3d 568 [121 Cal.Rptr. 11]), we recognize that defendant herein filed the certificate only out of an excess of caution and to forestall any fundamental procedural challenge to her appeal.

sometimes with defendant in Washington and sometimes with Shipley in Stockton. This prompted defendant to make numerous trips to Stockton.

In December 1979 defendant, Morton, Nation, a man named Frank Bangs, and two of defendant's adopted children spent Christmas with Morton's mother in Arizona. Within the six months preceding that Christmas visit, defendant's father (with whom defendant had been very close) died, and three of her adopted children suffered severe accidents or illnesses. Defendant had consulted her physician because of the stress related to these events and had been prescribed some antidepressant medication. Before returning to Washington, the group stopped in Oakdale, California, to enable Morton, who had been living with Shipley, to pick up her car and some personal effects.

However, after traveling to Stockton with Nation and Bangs, Morton changed her mind and decided to stay with Shipley. Shipley then accompanied Morton back to Oakdale, where Morton told defendant of the change in her plan. Defendant became upset and argued with Morton. Defendant left her house trailer, presumably to confront Shipley, who was waiting in Morton's vehicle, and Morton followed. During the ensuing confrontation, defendant had grasped the doorframe of Morton's vehicle and bent it six inches away from the car; following this, defendant apologized to Morton and permitted her to get into the car. Defendant then began walking away, but she turned suddenly and fired several shots from a revolver through the windshield. The shots struck Shipley, who died about two hours later as a result of the wounds. The shooting occurred on January 9, 1980, and defendant was arrested on the same date.

Defendant was incarcerated in the Stanislaus County jail, and within two days her mental condition had deteriorated to such an extent that she was confined in a padded cell. Because of defendant's suicidal depression, she was sedated by the jail physician. Deputy Public Defender Timothy Helfer, who had been appointed to represent defendant, contacted Dr. Patricia White. Dr. White has been a psychiatrist since 1954, is chairperson of the forensic committee for the Central California Psychiatric Society, is a consultant for the California Youth Authority, and is board certified in both psychiatry and forensic psychiatry. Dr. White has qualified on numerous occasions to testify on the mental status of criminal defendants and has been called as an expert witness by both prosecution and defense counsel. Helfer believed she was a highly qualified psychiatrist.

Dr. White's first contact with defendant occurred on January 11, 1980, two days after the killing. Dr. White directed her examination to two areas of concern expressed by Helfer: (1) the immediate mental and emotional

state of defendant and (2) the probable mental state of defendant at the time of the killing. Dr. White made a diagnosis of significant depression in a nonpsychotic fashion and recommended to the jail physician that defendant's medication be continued. Dr. White saw defendant at the jail on four more occasions between January 17 and April 18, 1980. Dr. White discussed each visit with Helfer following her interview with defendant.

Although Dr. White did not prepare a written report until one was requested by the probation department on May 19, 1980, she had formulated a professional opinion by the end of January that defendant was mentally incapable of harboring malice, premeditating or deliberating at the time of the killing. This conclusion was included in her written report, but Dr. White had communicated her opinion to Helfer as early as the middle of February. Dr. White understood that Helfer would be seeking to prove that the killing was no more than voluntary manslaughter on either of two theories—heat of passion or diminished capacity. She stated positively that she had never advised Helfer that it would be in defendant's best interest to plead guilty to second degree murder.

On May 5 defendant, who had been freed on bail, saw Dr. White in her Stockton office. The doctor found defendant to be much more upset and distressed than she had been at their last visit in April. At the hearing on defendant's motion to withdraw her guilty plea, Dr. White testified unequivocally that, in her medical opinion, defendant could not have made a cognitive, intelligent decision to plead guilty and make the attendant waiver of constitutional rights three days after their interview. She expressed the belief that defendant's mental condition could only have worsened between May 5, the date of the interview, and May 8, the date of the plea.

After defendant entered her guilty plea on May 8, she surrendered herself to the jail, and the jail physician who had treated her during her earlier time of incarceration described her as a woman who was "quite anxious" and "deeply depressed."

Defendant testified that, although she saw Helfer three or four times between the time of her arrest and the taking of her plea, she never met with Helfer and Dr. White at the same time. She also testified that Helfer never told her of the doctor's conclusions concerning defendant's lack of capacity to form and hold certain mental states. Defendant did not discuss any change of plea with Dr. White on May 5, the date of her last visit preceding entry of the plea, as she had no intention at that time of changing her plea.

The first time defendant saw Dr. White's report containing the conclusions about defendant's mental condition at the time of the killing was after

defendant had been sentenced and confined in the California Institution for Women. The counselor at that facility had reviewed defendant's records and asked her why she had pleaded guilty to second degree murder.

At the hearing on the motion to vacate and set aside defendant's guilty plea and the judgment based thereon, the defense and the prosecution entered into a stipulation that if, at the time defendant entered her guilty plea, she were taking the amount of medication *prescribed,* the medication would not have affected her thinking. Defense counsel specifically excluded from this stipulation any consideration of whether Elavil, one of the medications prescribed for defendant, had an adverse effect on her or whether she was taking more medication than had been prescribed.

Deputy Public Defender Helfer testified at the hearing on the motion and contradicted much of defendant's testimony concerning the conversations between them. Although extensively examined and cross-examined, he never did testify that he reviewed with defendant Dr. White's conclusions following her various examinations of defendant or the testimony Dr. White was prepared to give.

A careful review of the record reveals that the trial court failed to develop on the record a factual basis for the guilty plea. The only expression of concern by the trial court over the existence of a factual basis was the court's inquiry of defense counsel as to whether a factual basis did exist, and that occurred after defendant had actually entered her guilty plea.

### DISCUSSION

Defendant's primary contention on appeal is that the trial court abused its discretion when it denied her motion to withdraw her plea of guilty. ▮▮ ▮▮ ▮▮ Defendant argues the denial of her motion was an abuse of discretion for three reasons: (1) her plea of guilty was not knowingly and intelligently made because of the failure of defense counsel to advise her of the nature of Dr. White's anticipated testimony; (2) her plea of guilty was not voluntarily made in that defense counsel failed to investigate defendant's mental state at the time of the plea; and (3) her plea of guilty was the result of coercion, oppression or misrepresentation on the part of defense counsel.

▮▮ ▮▮ Before discussing defendant's arguments, we consider the law applicable to review of the trial court's ruling on a motion to withdraw a guilty plea. In *People* v. *Urfer* (1979) 94 Cal.App.3d 887 [156 Cal.Rptr. 682], the court stated: "We accept as established principles that: 'The granting or denial of an application to withdraw a guilty plea is within the discretion of the trial court after a consideration of all the factors necessary to

bring about a just result; and the decision of the trial judge will not be disturbed on appeal unless an abuse thereof is clearly demonstrated. [Citations omitted.] While the section [§ 1018] is to be liberally construed and a plea of guilty may be withdrawn for mistake, ignorance, or inadvertence or any other factor overreaching defendant's free and clear judgment, the facts of such grounds must be established by clear and convincing evidence. [Citations omitted.]' " (*Id.,* at pp. 891-892.)

■ The appellate court's role in determining whether a defendant satisfied his burden of producing clear and convincing evidence in the trial court is defined in *People* v. *Savin* (1940) 37 Cal.App.2d 105, 108 [98 P.2d 773]: "All questions of the weight and sufficiency of the evidence are addressed, in the first instance, to the trier of fact, in this case, the trial judge. We cannot reverse his order if there is substantial evidence or a reasonable inference to be drawn from it which supports the order. Where two conflicting inferences may be drawn from the evidence it is our duty to adopt the one supporting the challenged order."

■ ■ Under the *Savin* standard of review we believe defendant's second and third arguments stated above must be rejected. There is a conflict in the evidence supporting those arguments, and the conflicts must be resolved against defendant. ■ We believe the same considerations do not apply to defendant's first argument.

Notwithstanding defendant's burden of producing clear and convincing evidence that a guilty plea was not the product of a knowing, intelligent and voluntary decision, and notwithstanding the deference to be afforded the trial court's resolution of credibility conflicts, this court should not rubber-stamp a decision of the trial court when the totality of the circumstances indicates the court's discretion has been abused. As our Supreme Court stated in *People* v. *Superior Court* (*Giron*) (1974) 11 Cal.3d 793 [114 Cal.Rptr. 596, 523 P.2d 636]: "A trial court, nevertheless, in the exercise of its discretion directed to the promotion of justice may take into consideration such material matters with which an accused was confronted and as to which he made erroneous assumptions when he entered a guilty plea. . . . As a general rule, a plea of guilty may be withdrawn 'for mistake, ignorance or inadvertence or any other factor overreaching defendant's free and clear judgment.' [Citations omitted.]" (*Id.,* at p. 797.) After distinguishing those cases in which an accused had pleaded guilty hoping for leniency which did not come about (in which cases the plea will generally not be set aside), the court concluded: "[T]he test of abuse in such circumstances is whether after consideration of all relevant factors there was good cause shown for granting the motion and whether justice would be promoted thereby. [Citations omitted.]" (*Id.,* at p. 798.)

*Did the trial court abuse its discretion in failing to permit defendant to withdraw her guilty plea because she had been inadequately advised by counsel before entering that plea?*

As discussed above, the psychiatrist selected by defense counsel to examine defendant had formed the professional opinion that defendant was incapable of premeditating or deliberating or, further, of harboring the mental element of "malice aforethought." Within Dr. White's understanding as a certified forensic psychiatrist, such a finding, if believed by the trier of fact, would have precluded any conviction for either first or second degree murder. Defendant contends, and it is uncontroverted, that her attorney, Helfer, never advised her that Dr. White had reached this opinion, notwithstanding additional uncontroverted evidence that White had advised Helfer of her finding as early as February 1980.

The United States Supreme Court has consistently shown the same solicitousness and concern as has the California Supreme Court that guilty pleas not be improvidently entered. In the landmark case of *Brady* v. *United States* (1970) 397 U.S. 742 [25 L.Ed.2d 747, 90 S.Ct. 1463] the Supreme Court considered the voluntariness of a guilty plea entered in order to avoid the potential imposition of the death penalty. The Supreme Court rejected defendant's contention that his guilty plea was (a) involuntary in that he had pleaded guilty in order to avoid the possibility of the death penalty, defendant being fully aware of the direct consequences of his plea; and (b) unintelligent for the failure of trial counsel to anticipate a future Supreme Court decision which would have affected the defendant's considerations regarding the guilty plea. However, even under these circumstances the court did state in conclusion: "Accordingly, we take great precautions against unsound results, and we should continue to do so, whether conviction is by plea or by trial. We would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves. But our view is to the contrary and is based on our expectations that courts will satisfy themselves that pleas of guilty are voluntarily and intelligently made by *competent defendants with adequate advice of counsel* and that there is nothing to question the accuracy and reliability of the defendants' admissions that they committed the crimes with which they are charged." (*Id.,* at p. 758 [25 L.Ed.2d at pp. 761-762], italics added.)

Defendant in the instant case, through a colloquy among defense counsel, the prosecutor and the trial court, ostensibly entered her plea pursuant to *People* v. *West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409], i.e., to avoid possible conviction of first degree murder. However, the Supreme Court in *West* also held, "A defendant who knowingly and voluntarily

pleads guilty or nolo contendere can hardly claim that he is unaware that he might be convicted of the offense to which he pleads; his plea demonstrates that he not only knows of the violation *but is also prepared to admit each of its elements.*" (*Id.,* at p. 612, italics added.)

Although, as pointed out above, Helfer testified at length at the hearing on the motion, he never testified that defendant acknowledged or admitted the cognitive mental state at the time Shipley was killed which would render defendant guilty of second degree murder. On the contrary, defendant testified it had consistently been her position, of which defense counsel was aware, that she could not recall her mental state at the time of the shooting. Although she recalled firing the gun, she didn't recall who, if anyone, she had hit. She was aware of screams and glass breaking, but she had no further recollection until she awoke in the padded cell at the Stanislaus County jail. Under all the circumstances of this case, it would be unfair to speculate that defendant was prepared to admit the elements of the offense to which she was pleading guilty. That unfairness is compounded in this case by the trial court's failure to develop on the record a factual basis for the plea.

Much of the unfairness arises because of defense counsel's failure to advise defendant of Dr. White's professional opinion. The People attempt to avoid the severe problem raised by this omission by arguing that (1) defense counsel's discussion with defendant concerning the elements of manslaughter and (2) defendant's knowledge that Dr. White had been subpoenaed to testify were sufficient to constitute counsel's informing defendant of Dr. White's conclusions about defendant's mental state at the time of the killing. The People's argument is not persuasive because it presumes that defendant could *only* infer that Dr. White's testimony would be substantially exculpatory. A layperson charged as a criminal defendant can hardly be expected to reason, from superficial knowledge about the necessary elements of voluntary manslaughter and the isolated fact that an examining psychiatrist has been subpoenaed to testify, that the *only* possible purpose for calling the psychiatrist at trial would be to elicit testimony equivalent to the substantial mental incapacity which Dr. White found in the instant case. To a lay defendant, knowledge that an examining psychiatrist has been subpoenaed by defense counsel, standing alone, could suggest any one of a number of options ranging along the spectrum of potential defenses. The presumption engaged in by the People is insufficient to satisfy the *Brady* standard of "adequate advice of counsel," (*Brady* v. *United States, supra,* 397 U.S. 742, 758) and, absent this presumption, the record is devoid of any evidence whatsoever that defense counsel actually advised defendant, in concrete terms, of Dr. White's professional opinion. Despite lengthy testimony, Hel-

fer never stated that he had so advised defendant, a crucial and telling omission.

In *In re Williams* (1969) 1 Cal.3d 168 [81 Cal.Rptr. 784, 460 P.2d 984] the defendant pleaded guilty to forgery in violation of section 470 in connection with unauthorized use of some credit cards. In defendant's petition for writ of habeas corpus he sought to have the ensuing judgment reversed on the basis that he could only have been guilty of violation of former section 484a, and under *People* v. *Swann* (1963) 213 Cal.App.2d 447 [28 Cal.Rptr. 830] the state could not prosecute under a general felony statute when the acts alleged fell within the proscriptions of a specific statute. The public defender who had represented the defendant at trial stated he was not aware of the *Swann* opinion at the time of defendant's plea. In its decision permitting defendant to set aside the judgment, the court stated: "The deputy public defender rationalized his recommendation to plead guilty to the forgery charge in the 1966 trial at the 1968 reference hearing by arguing that petitioner bargained away his *Swann* defense in return for the possibility of a misdemeanor forgery sentence. The record discloses, however, that petitioner and defense counsel had no idea that there was a *Swann* defense, and can hardly be said to have bargained it away. [Citation omitted.] In any event the record clearly states that the attorney did not discuss the defense with his client at all. We cannot excuse the attorney from the obligation to inform his client of this crucial defense by permitting counsel to disregard the police report and to accept defendant's story of the credit card's ownership at face value. If the attorney can indulge in such secret deliberation about the fate of his client, he leaves his client in the position of reaching a critical decision in complete ignorance." (*In re Williams, supra,* 1 Cal.3d at p. 177, fns. omitted.)

In the instant case defense counsel's failure to advise defendant that Dr. White believed defendant could neither premeditate, deliberate nor harbor malice aforethought placed defendant's counsel in the same position of engaging in secret deliberations condemned by the Supreme Court in *Williams, supra,* 1 Cal.3d 168. Defendant cannot be said to have bargained away her right to have a trier of fact evaluate Dr. White's testimony when she did not know what that testimony would be. Other factors which might dilute or enhance the weight of such anticipated testimony were not for defense counsel, alone and in secret, to evaluate without discussion with defendant.

Because defendant's testimony is uncontroverted, i.e., she was not advised what Dr. White would testify to concerning her mental condition at the time the shooting occurred, there is no evidence to support the trial court's determination that defendant's plea of guilty was knowingly and intelligently made. Even assuming defendant did have knowledge of the

consequences of her plea, it is clear from the record that she did not have knowledge of a defense, not only potentially meritorious, but absolutely critical to her case. ██ ██ ██ Thus we conclude that, under all the circumstances of this case, the trial court abused its discretion in denying defendant's motion to withdraw her guilty plea.[3]

The decision denying defendant's motion is reversed and the trial court is directed to permit defendant to reinstate her plea of not guilty.

Hanson (P. D.), Acting P. J., and Andreen, J., concurred.

---

[3]Our decision that the trial court abused its discretion in denying defendant's motion to set aside her guilty plea rests upon our holding that the plea was neither intelligent nor voluntary when defense counsel had failed to advise defendant of evidence vital to her defense. Therefore it is unnecessary for us to evaluate in depth the extent of the trial court's error in failing to develop on the record the factual basis for the guilty plea. We note, however, the purposes identified by the court in *People* v. *Watts* (1977) 67 Cal.App.3d 173 [136 Cal.Rptr. 496] that are accomplished by requiring the trial court to develop the factual basis for the plea on the record, pursuant to section 1192.5, were not served in the instant case. Without such a factual basis, neither this court nor the trial court could satisfy itself that defendant understood the nature of the charges against her, that she understood her acts constituted the offense with which she was charged, and that she committed a crime at least as serious as the one to which she was willing to plead. Thus there is no basis on which this court could have concluded that defendant was not prejudiced by defense counsel's failure to adequately advise her of the evidence available in her defense.