Filed 11/7/23  P. v. Morones CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARTIN MORONES,<br><br>        Defendant and Appellant. | B326150<br><br>(Los Angeles County<br>Super. Ct. No. KA080781) |

        APPEAL from an order of the Superior Court of Los Angeles County.  Mike Camacho, Judge.  Affirmed.

        Law Office of Stein and Markus, Andrew M. Stein, Joseph A. Markus and Joseph E. Markus for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven E. Mercer and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2007, defendant and appellant Martin Morones and Robert Canizalez (Canizalez)[1] engaged each other in a high-speed street race that ultimately killed two young children and their mother. A jury subsequently convicted defendant on three counts of second degree murder.[2] (Pen. Code, § 187, subd. (a).)[3] It also found true the allegations that he personally inflicted great bodily injury (§ 1203.075, subd. (a)). Defendant was sentenced to an aggregate term of 45 years to life.[4]

This is defendant's third appeal in this case. In the first, we affirmed his convictions. (*People v. Canizalez* (2011) 197 Cal.App.4th 832 (*Canizalez*).) In the second, defendant appealed from the trial court's denial of his petition for resentencing pursuant to section 1172.6.[5] We reversed the trial court's ruling and remanded the matter for an evidentiary hearing per section 1172.6, subdivision (d)(3). (*People v. Morones* (Dec. 7, 2021, B309121) [nonpub. opn.].)

---

[1]     Canizalez is not a party to this appeal.

[2]     The jury also convicted defendant on three counts of vehicular manslaughter with gross negligence.

[3]     All further statutory references are to the Penal Code unless otherwise indicated.

[4]     The trial court stayed sentencing on the manslaughter convictions pursuant to section 654.

[5]     When defendant filed his petition, the relevant resentencing statute was numbered section 1170.95. Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) For simplicity, we refer to the section by its new numbering.

At that hearing, the trial court again denied defendant's petition, finding that he could still be convicted under the doctrine of implied malice murder.  Defendant now appeals for a third time.  We find no error and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     The 2009 Conviction and First Appeal[6]

#### A.     *The Fatal Race*

The fateful car race took place on the streets outside of Brookside Mobile Home Park (Brookside) in El Monte, California.  "Brookside had approximately 500 units and only one entrance and exit, which was on Elliott Avenue, east of Parkway Drive.  Proceeding east on Elliott Avenue across Parkway Drive led directly into Brookside." (*Morones*, *supra*, B309121.)  "The posted speed limit on Parkway Drive was 30 miles per hour.  Mountain View High School was in the area." (*Ibid.*)

"On October 8, 2007, between 5:00 and 5:30 p.m., Canizalez [was] driving a red Mustang and [defendant was] driving a brown Honda north on Parkway Drive," about "a quarter of a mile south of the intersection of Parkway Drive and Elliott Avenue." (*Morones*, *supra*, B309121.)  The Honda had been modified significantly to increase its speed and maneuverability; it had been "'lowered "by changing out the coil springs," the diameter of its rims had been changed to lower its height and increase its maneuverability at high speeds, it had an illegally modified air intake system, its catalytic converter had been removed, and there had been "modification of the headers," part of the exhaust system.'" (*Ibid.*)

---

[6]     We take many of the facts in this section from our opinion in *Morones*, *supra*, B309121, which itself quoted liberally from our opinion in *Canizalez, supra,* 197 Cal.App.4th 832.

Defendant and Canizalez stopped their cars side by side at an intersection with a four-way stop sign. (*Morones*, *supra*, B309121.) They "exchanged words, their tires screeched and they raced side by side on Parkway Drive, attaining speeds up to 87 miles per hour." (*Morones*, *supra*, B309121.) Two witnesses reported that defendant's car quickly took the lead. (*Ibid.*)

At the same time, Dora Groce (Groce), a Brookside resident, was driving her car, "a 2002 Nissan Altima," out of "Brookside into the intersection of Elliot Avenue and Parkway Drive," which also had a four-way stop sign. (*Morones*, *supra*, B309121.) Her eight-year-old son, Robert, and four-year-old daughter, Katherine, were in the backseat of the car. (*Ibid.*)

As defendant and Canizalez raced north on Parkway Drive, they drove through the intersection of Elliot Avenue without stopping. (*Morones*, *supra*, B309121.) Two witnesses reported that "the Honda hit[] the rear of the Altima and then the Mustang hit[] the front[;]" "[a]nother witness was unable to tell if one or both cars hit the Altima." (*Canizalez*, *supra*, 197 Cal.App.4th at p. 838, fn. 2.) "'The Altima was pushed into a green truck . . . and burst into flames. The truck was turned 180 degrees. The Honda hit a red Nissan Sentra . . . [which] then hit a red Camaro in front of it.'" (*Morones*, *supra*, B309121.)

A firefighter responding to the scene "'saw the Altima "totally involved with fire." Black smoke and flames were inside the car, with a burning woman visible in the front seat.'" (*Morones*, *supra*, B309121.) The firefighter heard "'"[v]oices of children screaming" . . . from the back of the car. The flames and intense heat made it difficult to break the windows and impossible to free the occupants. When the fire was extinguished, three bodies were found inside the car. The two in

the rear had their arms stretched out as if reaching for each other.  The victims were later identified as Groce, Katherine and Robert.'" (*Morones*, *supra*, B309121)

Immediately after the collision, defendant, aided by Canizalez, "'push[ed] the Honda into Brookside.'" (*Morones*, *supra*, B309121.)  Defendant "'fled to Mexico but was later deported back to the United States.'" (*Ibid.*)

**B.    *The Investigation***

"'Fontana Police Captain Dave Faulkner, a traffic collision reconstruction expert, reviewed the investigation file, including diagrams, police reports and photographs, went to the scene and took photographs, and inspected the involved cars.  He calculated that the minimum highest potential speed of the Mustang was 77 miles per hour, and could have been as high as 87 miles per hour, and of the Honda was 80 miles per hour, and could have been as high as 86 miles per hour.  Based upon damage to the two vehicles, Captain Faulkner believed that, at some point, they had hit each other.

"'In his report, Captain Faulkner stated that the primary collision factor was attributed to the driver of the Mustang because it was "his impact and his cause that was the direct result of your party's death."  "[T]he Vehicle Code and the California reporting system that deals with traffic collision requires [sic] you to pick the one cause."  However, he nonetheless opined that both drivers shared the cause of the collision.  It was caused by the running of the stop sign by the two cars and their unsafe speed.  While he believed that the Honda did not hit the Altima, because there was so much damage from the fire to the back and side of the Altima, "[t]here was no way to tell."'" (*Morones*, *supra*, B309121.)

5

### C.   *The Trial*

"The prosecutor proceeded on two theories of murder liability:  implied malice and the natural and probable consequences doctrine.  The jury was instructed on both theories."  (*Morones*, *supra*, B309121.)

### D.   *The First Appeal*

On appeal, "we rejected the argument that there was insufficient evidence to support the murder convictions for Canizalez and [defendant] because there was overwhelming evidence of implied malice as well as ample evidence of causation."  (*Morones*, *supra*, B309121; see also *Canizalez, supra*, 197 Cal.App.4th at pp. 841–846.)  We also concluded, among other things, that sufficient evidence demonstrated that defendant and Canizalez "were guilty of second degree murder as joint, direct perpetrators of the deaths of Groce and her children.  As joint perpetrators they were 'equally guilty' of the charged offense."  (*Canizalez, supra*, at p. 850.)

## II.   The Resentencing Petition

### A.   *Petition and Second Appeal*

"On July 28, 2020, [defendant] filed a petition for resentencing pursuant to section 117[2.6]."  (*Morones*, *supra*, B309121.)  The trial court held a contested hearing to determine whether the petition established a prima facie showing of eligibility for resentencing.  (See § 1172.6, subd. (d)(1).)  Defendant was represented by private counsel.  (*Morones*, *supra*, B309121.)  "[T]he trial court denied the petition . . . conclud[ing] that [defendant] had been convicted of implied malice murder" and was thus ineligible as a matter of law for resentencing relief.  (*Morones*, *supra*, B309121.)

6

On appeal, we found that "while there was strong evidence indicating that [defendant] acted with implied malice due to the danger inherent in his conduct . . . the record of conviction did not establish as a matter of law that the jury convicted [defendant] based on an implied malice theory rather than on a natural and probable consequences theory." (*Morones*, *supra*, B309121.) We thus remanded for an evidentiary hearing pursuant to section 1172.6, subd. (d)(3), at which the trial court could properly resolve this issue. (*Morones*, *supra*, B309121.)

### B.  *Evidentiary Hearing*

In October 2022, the trial court held that evidentiary hearing. Defendant, again represented by private counsel, submitted a brief arguing, among other things, that the record contained insufficient evidence to support a conviction on a theory of implied malice murder. He attached as exhibits our decision in *Morones*, *supra,* B309121, a reporter's transcript of the prosecutor's closing arguments at the 2009 trial, and a reporter's transcript of the 2020 prima facie hearing on defendant's petition.[7] Neither defendant nor the prosecution presented any new evidence.

At the hearing, the prosecution argued that defendant could still be convicted of murder on the theory of implied malice. The trial court ultimately agreed and denied the section 1172.6 petition, finding that defendant possessed "the subjective awareness necessary for murder."

---

[7] At the beginning of the evidentiary hearing, the trial court indicated that it had "reviewed the paperwork submitted by both sides." However, the appellate record does not reflect that the prosecution submitted any papers in advance of the hearing.

The trial court explained its reasoning at length, beginning by noting that "you cannot have a speed race without at least two participants, and each of those participants are equally responsible for the tragic consequences that took place regardless of . . . whose vehicle hit the victim['s] vehicle."

The trial court then focused on the nature of defendant's conduct, finding that by "speeding . . . the way they did and [racing] vehicles that were modified to enhance their speed . . . demonstrates a lack of respect and consideration for pedestrian traffic and other motorists. That is a disregard for human safety[,]" particularly since the race "was done . . . at a period of time in which there is a high volume of traffic because of the hour of the day." The court also pointed to defendant's "post-accident conduct which . . . demonstrated [a] complete lack of concern for the victims who were engulfed in flames and trapped in their vehicle. Instead, he acted for his own protection [by] concealing his vehicle and ultimately fleeing the jurisdiction."

The trial court also "infer[red]" from defendant's conduct during the race that he "had that subjective awareness . . . separat[ing] murder from manslaughter because . . . he was well aware that this type of conduct is inherently dangerous to human life, and I think any driver recognizes that . . . . It's just common knowledge that you do not engage in this kind of activity and come back and say I was completely oblivious to how dangerous my act was to human life."

The trial court emphasized that it was "not considering . . . Canizalez's conduct . . . and imputing anything upon [defendant] based upon Canizalez's activity. . . . This is all [defendant]'s conduct. And for that reason I think that the law is

8

satisfied even under the new changes that [defendant] is responsible for the murders of these three victims."

Defendant timely appealed.

## DISCUSSION

### I.    Background Legal Principles

The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Among other changes, Senate Bill No. 1437 amended section 188 to "permit[] a second degree murder conviction only if the prosecution can prove the defendant acted with the accompanying mental state of mind of malice aforethought. The prosecution cannot 'impute[ ] [malice] to a person based solely on his or her participation in a crime.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 846, quoting, § 188, subd. (a)(3).)

Senate Bill No. 1437 also created section 1172.6, which "provides a mechanism by which a person convicted of murder under a natural and probable consequences theory may be resentenced if they could no longer be convicted of murder because of the changes to section 188." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 950–951 (*Vargas*).)

Under section 1172.6, a person convicted of murder "may file a petition with the court that sentenced [him] to have [his] . . . conviction vacated and to be resentenced on any remaining counts" if he avers that "[a] complaint, information, or indictment was filed against [him] that allowed the prosecution to proceed

under a theory of felony murder, murder under the natural and probable consequences doctrine, or other theory under which malice is imputed to a person based solely on that person's participation in a crime[;]" and that he "was convicted of murder . . . following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder . . . [;]" and that he "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made" by Senate Bill No. 1437.  (§ 1172.6, subd. (a)(1)-(3).)

"Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an evidentiary hearing at which it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing.  [Citations.]  If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6.  [Citations.]"  (*Vargas*, *supra*, 84 Cal.App.5th at p. 951.)

## II.    Standard of Review

"In determining whether a trial court correctly denied a section 1172.6 petition following an evidentiary hearing, ""we review the factual findings for substantial evidence and the application of those facts to the statute de novo.""  [Citation.]"  (*People v. Arnold* (2023) 93 Cal.App.5th 376, 383.)

When reviewing the trial court's factual findings, ""we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  [Citation.]  We

10

determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citations.] Substantial evidence also "'includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" [Citations.]" (*Vargas, supra*, 84 Cal.App.5th at p. 951.)

## III. Analysis

The trial court found that defendant remains guilty of murder under the doctrine of implied malice, which is still a viable theory of liability. (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1005 ["Senate Bill [No.] 1437 did nothing to remove implied malice as a basis for a second degree murder conviction"].) We conclude that substantial evidence supports the court's finding.

### A. Substantial Evidence Supports the Implied Malice Finding

"Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"" [Citations.]" (*People v. Reyes* (2023)14 Cal.5th 981, 988 (*Reyes*).)

As we noted in *Canizalez*, *supra*, 197 Cal.App.4th 832 and *Morones*, *supra*, B309121, the record of conviction in this case substantially supports findings of both causation and implied malice. Defendant raced his car, which was illegally modified to increase its capacity for speed and maneuverability, through a residential and school neighborhood at speeds exceeding legal

11

limits by over 50 miles at peak traffic hours.  As the trial court noted, any driver, including defendant, must understand the danger inherent in this conduct.  (*People v. Murphy* (2022) 80 Cal.App.5th 713, 728 ["'It takes no leap of logic for the [trier of fact] to conclude that because anyone would be aware of the risk, [defendant] was aware of the risk.'  [Citation.]"].)

Defendant led the race as he and Canizalez approached the intersection near Brookside, which was populated by several other cars, including the victims' Altima.  He and Canizalez both sped through the stop sign at that intersection and promptly crashed into multiple cars.  The crash caused the Altima to burst into flames, consigning all three victims to a fiery grave.

Moreover, immediately following the crash, defendant made no attempt to help the bystanders or first responders who jumped into action and tried to rescue the screaming woman and children from their burning car.  (*People v. Palomar* (2020) 44 Cal.App.5th 969, 978 (*Palomar*) [failing to assist a wounded victim manifests "a callous indifference to human life"].)  Instead, defendant attempted to hide evidence by dragging his car away from the accident site and then fled the country.  (*People v. Famalaro* (2011) 52 Cal.4th 1, 35 [trier of fact may "infer consciousness of guilt from any attempts by defendant to conceal evidence"]; *People v. Leon* (2015) 61 Cal.4th 569, 607 [same, as to a defendant's flight after the crime].)

## B. Defendant's Counterarguments

Defendant raises three counterarguments, all of which are meritless. We address each in turn.

### 1. *Implied malice vs. imputed malice*

Defendant claims that the trial court's implied malice findings improperly impute malice to him solely because he committed various traffic crimes, such as street racing and speeding. But "[i]mplied malice is not imputed malice. It requires that the perpetrator actually and personally harbor malice." (*People v. Carr* (2023) 90 Cal.App.5th 136, 139 (*Carr*).) That is precisely what the trial court found here, expressly concluding "that the subjective awareness necessary for murder exists on the part of defendant."

Defendant maintains that the trial court's only basis for this finding is his violation of traffic laws and argues that mere "participation in a drag race without more does not form a predicate for murder." But defendant's conduct went far beyond breaking a few traffic laws. In the analogous situation of a defendant who kills a person while driving under the influence, courts have noted that "implied malice may be inferred from a defendant's conduct before, during, and after driving drunk—not imputed from the bare fact of driving drunk." (*Carr, supra,* 90 Cal.App.5th at p. 136, citing, *People v. Watson* (1981) 30 Cal.3d 290.) Similarly, the trial court inferred implied malice not from the "bare fact" of defendant's participation in an illegal street race, but from his flagrantly egregious conduct during and after that race.

### 2. *Proximate causation*

Defendant insists that he cannot be found to have caused the victims' murders because his car did not actually collide with

13

theirs.[8]  We refer defendant to our analysis in *Canizalez, supra,* 197 Cal.App.4th at p. 845: "[E]ven if the [trier of fact] concluded that [defendant's] car did not hit the Altima, the evidence was still sufficient to support a finding that he caused the victims' deaths.  It is proximate causation, not direct or actual causation, which together with the requisite mental state determines the defendant's liability for murder.  [Citation.]  . . . .  The People's burden of proving causation is met if evidence is produced from which it may be reasonably inferred that the defendant's act was a substantial factor in producing the result of the crime. [Citation.]"  "Canizalez and [defendant] were . . . jointly engaged in a speed race that led directly to the fatal collision and deaths. Captain Faulkner testified that the cause of the accident was the running of the stop sign *by the Honda and the Mustang* and *their unsafe speed* and that both drivers were responsible.  [Another officer] concluded in a report that the primary cause of the collision was street racing.  The evidence amply supports that [defendant's] actions were a proximate cause of the victims' death."[9]  (*Canizalez, supra,* at p. 846.)

---

[8]      Defendant claims that the trial court found that his car did not collide with the victims' car.  The court made no such determination at the evidentiary hearing; it merely stated that both defendant and Canizalez were "equally responsible for the tragic consequences that took place regardless of . . . whose vehicle hit the victim[s'] vehicle."

[9]      Defendant argues that our opinion in *Canizalez, supra,* 197 Cal.App.4th 832, "**IS NOT DISPOSITIVE OF THIS APPEAL**[,]" but offers no cogent reason as to why our prior conclusions about proximate causation do not apply equally here.

Defendant argues that our Supreme Court's recent opinion in *Reyes*, *supra*, 14 Cal.5th 981 undermines our reasoning in *Canizalez*, since it establishes that "acts [which] merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy th[e] causation requirement" of implied malice murder. (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

*Reyes* is readily distinguishable. The *Reyes* Court found that there was insufficient evidence of causation when the defendant's only acts were to bike into a rival gang's territory and, with other gang members, chase after the victim's car. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) The *Reyes* Court found it significant that "[t]here was no evidence that [the defendant's] acts precipitated or provoked the shooting" that caused the victim's death, and determined that "there is no reason to believe that the killing of [the victim] would not have occurred if [the defendant] had not accompanied his fellow gang members on the ride or participated in the chase." (*Ibid.*) Accordingly, the *Reyes* Court concluded that "any causal link between [the defendant's] conduct and [the victim's] death is tenuous at best." (*Ibid.*)

In stark contrast, there is an obvious and direct link between defendant's actions and the deaths of Groce and her children. There is ample evidence that the street race he both participated in and encouraged caused the crash that killed the victims; Captain Faulkner opined as much in his accident report. And if defendant had not participated in the race and, by his participation, encouraged Canizalez to continue racing, the crash would not have occurred, and the victims would still be alive. Accordingly, the record amply supports the trial court's finding that defendant proximately caused the victims' deaths.

### 3. *Disregard for human life*

Lastly, defendant argues that the record does not sufficiently prove that he "personally harbored a conscious disregard to human life[;]" instead, Captain Faulkner's testimony and report show that defendant "committed an act that negates implied malice" by "slamm[ing] [the] brakes," slowing down, and "turn[ing] the wheel to avoid hitting the Altima." Defendant avers that he "personally reduced the 'probability that death would result' from the [race] by avoiding the Altima."

This argument is flawed for several reasons. For one, defendant cites no legal authority for the proposition that taking one potentially protective action (amidst many other reckless ones evincing wanton disregard for human life) has the power to "negate" the presence of implied malice. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 ["'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]".)

Leaving that aside, defendant's argument fails on the merits. Under our substantial evidence standard of review, "'we cannot reverse [the trial court's] order if there is substantial evidence or a reasonable inference to be drawn from it which supports the order. Where two conflicting inferences may be drawn from the evidence it is our duty to adopt the one supporting the challenged order.'" (*People v. Harvey* (1984) 151 Cal.App.3d 660, 667.)

The evidence that defendant relies on to show his lack of malice—slamming on the brakes before the collision, decelerating speed at the moment of impact, and swerving away from the

16

Altima—could equally give rise to an inference supporting the existence of implied malice. Given Captain Faulkner's testimony that defendant and Canizalez's cars hit each other at some point, the trial court could reasonably have inferred that defendant hit the brakes, slowed down, and turned his wheel in an attempt to regain control of his car after hitting (or being hit by) Canizalez. From this perspective, defendant's actions would not evince concern for others, but for himself. Since this inference supports the trial court's order, we must adopt it and disregard defendant's contrary interpretation of the evidence.

And we cannot overlook that this inference is lent even greater credence by the record of defendant's actions immediately following the collision. He made no attempt to help the victims of the crash but thought only of himself, working to conceal evidence of his involvement while abandoning Groce and her children to burn to death. From this, the trial court was more than justified in concluding, beyond a reasonable doubt, that defendant acted with the very hallmark of implied malice: an "abandoned and malignant heart." (§ 188; see also *Palomar*, *supra*, 44 Cal.App.5th at p. 978.)

**DISPOSITION**

The trial court's order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.
HOFFSTADT


_____, J.*
KWAN

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.